Serena DEWAKUKU, Plaintiff,

v.

Andrew M. CUOMO, Secretary of the United States Department of Housing and Urban Development, Defendant.

No. CIV.A.98–00415–PCT–P.

United States District Court,
D. Arizona.

July 14, 2000.

Samuel Davis Gollis, DNA People's Legal Services Inc., Keams Canyon, AZ, for Plaintiff.

James C. Hair, Jr., U.S. Attorney's Office, Phoenix, AZ, Veronika Fabian, DNA-People's Legal Services, Flagstaff, AZ, for Defendant.

### MEMORANDUM AND ORDER

YOUNG, District Judge.[1]

## I. Introduction

Serena Dewakuku ("Dewakuku") is a member of the Hopi Indian Tribe. The Hopi Indians live on a reservation of nearly 4000 square miles in northeastern Arizona. Anthropologists believe that the general area in northern Arizona upon which the Hopi Reservation now stands has been occupied for as long as 10,000 years and continuously occupied for at least 2000 years.[2]

Beginning as early as 500 A.D., Hopi settlements were built on the tops of three mesas.[3] Dewakuku currently lives in the pueblo of Kykolsmovi on Third Mesa, very near the pueblo of Oraibi which is said to be the oldest continuously settled community in the United States.[4] The pueblos consisted of terraced apartment buildings of adobe arranged around streets and plazas. The structures were two or more stories in height.[5] Residence was matrilocal and extended families lived together.[6]

In light of the foregoing, it is rather ironic that this case involves a house—a house built in 1991 pursuant to a federal housing assistance program whose espoused purpose was to provide safe and decent housing to Native Americans. All parties agree this "modern" house was shoddy and inferior on the very day it was constructed.

## II. Background

Dewakuku brings this action against Andrew M. Cuomo (the "Secretary"), Secretary of the Department of Housing and Urban Development ("HUD") to obtain correction and repairs of the design and construction defects in her home. Dewakuku alleges three specific claims: (1) the Secretary violated the Indian Housing Act and its implementing regulations; (2) the Secretary breached his obligations under the Annual Contributions Contract of which Dewakuku is an intended beneficiary; and (3) the Secretary violated the Administrative Procedure Act ("APA") by failing to enforce the standards and perform his duties.[7]

1. Of the District of Massachusetts, sitting by designation.

2. Patti Epler, *Anti–Peace Pipes*, Phoenix New Times, Mar. 26, 1998.

3. Peggy Berryhill, *Hopi Potskwaniat: The Hopi Pathway to the Future*, 3/31/98 Native Am.-Akwe-kon's J. Indigenous Issues 31, *available in* 1998 WL 18039518.

4. *About the Hopi Indians* (visited Apr. 21, 2000) <http://www.3mesas.com/hopi/ main.html>.

5. *See* Marlene M. Martin, *Society–Hopi* (visited June 26, 2000) <http://lucy.ukc.ac.uk/EthnoAtlas/Hmar/Cult_dir/Culture.7846>.

6. *See id.*

7. Originally Dewakuku included a breach of an implied warranty of habitability. She has since dropped this claim.

Dewakuku is a home buyer under the federal Mutual Help Ownership Opportunity Program (the "Homeownership Program"), of a home built by the Hopi Tribal Housing Authority (the "Hopi Housing Authority") under contract with HUD. *See* Def.'s Exs. 6–11. She claims that the Secretary breached his regulatory, statutory, and contractual responsibilities, and as a result, she is living in an ill-designed, poorly constructed home with a malfunctioning electrical system, cracking walls and floors, a leaky roof, and popping nails, that is unsafe and expensive to heat. It is well documented that Dewakuku's attempts to obtain corrections of the defects through the Hopi Housing Authority were unsuccessful. *See* Def.'s Exs. 13–18.

Dewakuku seeks a declaratory judgment that the Secretary failed to meet his legal obligations under the Indian Housing Act of 1988 and its implementing regulations to provide her with a decent, safe, and sanitary home. She asks this Court to issue an order directing the Secretary to comply with his responsibilities by curing the defects in design and construction of her home either by repair or reconstruction. In addition, she seeks money damages for the breach of contract claim.

The Secretary admits that Dewakuku's home is substandard. He insists, however, that HUD is not responsible for the correction of these defects. According to the Secretary, the Indian Housing Act and its implementing regulations do not create any legally enforceable duties. Instead, he says Dewakuku must pursue a claim against the Hopi Housing Authority.

In a letter to this Court on October 13, 1999, the parties agreed that this action could be decided on their cross-motions for summary judgment. As there are no disputed issues of fact, the Court agreed.

### III. *Discussion*

#### A. *Historical Context*

"To understand the present, you must first learn about the past. That is the Hopi way . . . ."[8]

"Too often we neglect the past. Even more than other domains of law, 'the intricacies and peculiarities of Indian law deman[d] an appreciation of history.' "[9]

##### 1. *Federal Policy*

To appreciate the nuances and complexities of the legal issue before this Court, an understanding of the relationship between the United States government and Native American tribes is necessary. An overview of the evolution of federal policy[10] toward Native peoples sets the stage for a closer examination of Indian housing generally and the specific difficulties faced by Dewakuku.

For over two hundred years, Congress has vacillated between two conflicting policies: self-government for tribes and assimilation of Native peoples into mainstream America. The tension between these two goals is obvious. Moreover, their implementation has wrought havoc on the survival of the Native tribes and their individual members. Historically, policy implementation can be divided into a series of eras, each marked by new legislation to achieve federal goals.

The basis of these policies is the Indian trust doctrine. In the nineteenth century, the concept of "trust" crept into Indian law when the Supreme Court declared that

---

**8.** Patti Epler, *Anti–Peace Pipes*, Phoenix New Times, Mar. 26, 1998.

**9.** *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 511–12, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986) (Blackmun, J., dissenting) (quoting Felix Frankfurter, Foreword to a Jurisprudential Symposium in Memory of Felix S. Cohen, 9 Rutgers L.Rev. 355, 356 [1954] ).

**10.** *See generally* Building the Future: A Blueprint for Change "By Our Homes You Will Know Us" Final Report of the National Commission on American Indian, Alaska Native, and Native Hawaiian Housing, xiv (1992)(the "Housing Commission Report"). The Commission was established by Congress to evaluate the factors impeding the safe and affordable housing for Native Americans. The report begins with a broad overview of federal policy.

treaties with Indian tribes made them into "domestic dependent nations" whose relationship with the United States "resembles that of a ward to its guardian." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831). This trust relationship has been the source of two opposing visions, one emphasizing federal power, the other federal responsibility.[11] Congress has used the trust doctrine to implement a variety of programs.

Between 1881 and 1934, during the Era of Allotment and Assimilation, the federal government drastically reduced Indian land holdings from 156 million acres (an already diluted quantity) to 48 million acres.[12] Large tracts of tribal lands were opened to homesteading by non-Indians. This era also marked the advent of the Indian boarding schools at which Indian youth, removed from their homes and families, were required to abandon their languages, native dress, religious practices, and other traditional customs.[13]

In 1934, following a report by the Brookings Institute that chronicled the severe conditions faced by Native Americans,[14] Congress attempted to undo the damage inflicted during the Era of Allotment and Assimilation.[15] New legislation re-established tribal governments, provided funds to recover lost lands, and set up programs to encourage tribal economic development. The government's benevolent attitude, however, was short-lived.

In 1953, during what became known as the Termination Era, Congress made a radical shift in its relationship with Native American tribes. Legislation unilaterally terminated federal recognition of more than 100 tribes and, consequently, federal services and protection.[16] Large tracts of Indian lands were once again allowed to pass into non-Indian hands, further exhausting an already scarce resource.[17] During this period, a "relocation program" was instituted, Indians were encouraged to move away from the reservation to urban areas, and tribal economic development was largely ignored.

During the present era, referred to as the Era of Self–Determination, the federal government has attempted to work with the Native American tribes to aid them in establishing tribal sovereignty while still recognizing its special duties to the welfare of Native people.[18] President Nixon summarized this new approach in his Special Message on Indian Affairs. "[W]e must make it clear that Indians can become independent of Federal control without being cut off from Federal concern and Federal support." [19] This has been a balance that has been difficult to achieve.

**11.** *See* Robert N. Clinton et al., *American Indian Law: Cases and Materials* 249 (3d ed.1991).

**12.** *See* Richard A. Monette, *Governing Private Property in Indian Country: The Double–Edged Sword of the Trust Relationship and Trust Responsibility Arising Out of Early Supreme Court Opinions and the General Allotment Act*, 25 N.M. L.Rev. 35, 41 (1995).

**13.** *See* Housing Commission Report at 4.

**14.** The Meriam Report, published by the Brookings Institute in 1928, documented "the extreme poverty, devastating epidemics and health crises, substandard housing, poor nutrition, and unsatisfactory schooling which afflicted the lives of a great majority of First Americans." Susan J. Ferrell, *Indian Housing: The Fourth Decade*, 7 St. Thomas L.Rev. 445, 450 (1995) [hereinafter Ferrell] (citing Institute for Government Research, The Prob-

lem of Indian Administration [1928]); *see also* Housing Commission Report at 5.

**15.** *See* Ferrell at 450 (stating that report "clearly documented the harmful results of Federal Indian policy").

**16.** *See id.* at 452.

**17.** *See* Housing Commission Report at 6.

**18.** *See id.* at 7 ("In essence, the policy of self-determination holds that Indian tribes should be the basic governmental units of Indian policy.").

**19.** Note, *Sword Wielding and Shield Bearing: An Idealistic Assessment of the Federal Trust Doctrine in American Indian Law* 2 Tex. F. on C.L. & C.R. 165, 169 n.16 (1996) (quoting President Richard M. Nixon, Special Message on Indian Affairs, 1970 Pub. Papers 564–67 [July 8, 1970], *reprinted in* Documents of Unit-

## 2. *Indian Housing Legislation*

Not surprisingly, the vacillating federal policies and resulting disruption and dislocation has helped create a Native American housing crisis. Twenty-eight percent of all Indian and Alaska Native families live in substandard, overcrowded housing that lack the basic amenities of indoor plumbing, electricity and heating. *See* 142 Cong. Rec. S12405 (daily ed. Oct. 3, 1996) (remarks of Senator McCain). By way of comparison, less than five and one-half percent of all Americans live in similar conditions. *See id.* Additionally, more than 90,000 Native American families are estimated to be under-housed or homeless. *See id.* These severe housing problems are compounded by poverty and unemployment levels in Native American communities that have reached epidemic proportions. *See id.* The number of Indian families with incomes below the poverty line is nearly three times the average rate for families throughout the rest of the nation. The average income of Native Americans is less than $4,500 per year. *See id.*

The lack of housing available on Native lands amplifies the devastating effects of the federal government's ambivalence toward the American Indian. As late as 1992, the first year Dewakuku lived in her home, a report on Indian Housing stated:

> Indian housing has been and remains grossly substandard in comparison with housing nationwide. Public health, social conditions, education, economic opportunity, and a host. of other facets of Indian life have been negatively affected by the protracted housing crisis suffered by our nation's first residents.[20]

While national housing legislation to help Americans find decent, safe, and sani-

tary living conditions was introduced in 1937, programs for Native Americans were not created for another thirty years. This gap of nearly three decades is not surprising, however, given the federal policy regarding assimilation and the slow erosion of tribal lands.

It wasn't until 1962 that the Public Housing Administration, the predecessor to HUD, determined that the 1937 Housing Act even authorized low-rent housing programs on Indian lands.[21] The advent of the program coincided with the assertion of tribal sovereignty. Previously, prevailing legal doctrines had held that tribes did not have the requisite power to enact housing ordinances and to create housing agencies.[22] A housing agency, however, is necessary to receive funds from the federal government.[23] Thus, the government's refusal to recognize the legitimacy of a tribal government's act was a major impediment to the correction of the housing crisis for Native Americans.

Although technically an exercise of tribal sovereignty, the Indian Housing Authority is, in reality, a creature of HUD. HUD's regulations "permit" a tribal government to create an Indian Housing Authority. *See* 24 C.F.R. §§ 905.108(a), 905.109 (1990). In every instance where a tribal government creates a housing authority, it must follow the exact format prescribed by HUD. *See* 24 C.F.R. § 905.109. Furthermore, HUD will not enter into a contract with an Indian Housing Authority unless the tribal ordinance creating the housing authority is submitted to and approved by it. *See id.* Moreover, the ordinance must be submitted with evidence that the tribal government's enactment was either approved by the Secretary of the Interior or that the Secretary

---

ed States Indian Policy 256–58 [Francis P. Prucha ed., 2d ed.1990] ).

**20.** *See* Housing Commission Report at xiv.

**21.** *See* Mark K. Ulmer, *The Legal Origin of Indian Housing Authorities and the HUD Indian Housing Programs,* 13 Am. Indian L.Rev. 109, 110–11 (1988) [hereinafter Ulmer].

**22.** *See* Staff of Senate Comm. on Interior & Insular Affairs, 94th Cong., 1st Sess., Staff Report on the Indian Housing Effort in the United States with Selected Appendices 3 (Comm. Print 1975).

**23.** *See* Ulmer at 114.

of the Interior has reviewed the ordinance and does not object to it. *See id.* The Model Tribal Ordinance, first conceived by HUD in 1962, sets out the functions of the Indian Housing Authority and lists its primary purpose as the eradication of unsafe and unsanitary housing conditions on the reservation.

Prior to the enactment of the Indian Housing Act of 1988, low-income rental programs on Indian lands were operated through the Housing Act of 1937.[24] A separate program called the Mutual Help Homeownership Opportunity Program (the "Homeownership Program") was administered through regulations and an Indian Housing Handbook. The Homeownership Program was established to help low-income Native Americans purchase their own homes. Because Indian lands are held in trust by the government and alternative financing is often unavailable, this is, in essence, the only opportunity for Native Americans to participate in the American dream of home ownership.[25]

Unfortunately, this informal program proved ineffective to remedy the Indian housing crisis. The housing needs of Native Americans in Indian Country were radically different from the needs of low-income Americans in urban areas. Despite the inclusion of Native Americans in the Housing Act of 1937, there remained a substantial number of Indians in need of basic shelter. *See* House Report at 791. The House Report indicated that in 1987, 23.3% of the Native Americans, as compared to 6.4% of the total American population, continued to live in substandard housing, *id.*, and on some reservations the percentage rose to an astonishing 75%. *See* 134 Cong. Rec. S7608 (daily ed. June 10, 1988) (remarks of Senator Cranston). To address the special housing needs of Native Americans, Congress established a separate program to provide housing assistance for Indians referred to as the Indian Housing Act. *See* 42 U.S.C. §§ 1437aa-ff (1988).[26]

The necessity of separate housing legislation went beyond the recognition of the severe housing shortage. "Separating Indian housing from public housing will affirm the Federal Government's commitment to provide housing in Indian areas and recognize the unique relationship between the U.S. Government and the Indian tribes and the special housing problems of Indians." 134 Cong. Rec. H3055 (daily ed. May 10, 1988) (remarks of Congresswoman Roukema); *see also* 134 Cong. Rec. S7608 (daily ed. June 10, 1988) (remarks of Senator Cranston) ("The provisions of [the Indian Housing Act] reaffirm the Federal Government's commitment to provide housing in Indian areas and recognize the unique relationship between the U.S. Government and the Indian tribes."). Thus, the Indian Housing Act was more than a codification of an existing program; it was a recognition of the Federal Government's obligation to procure housing for Native American families and individuals.

The Indian Housing Act mandates the Secretary of the Housing Department to

---

**24.** Although the Indian Housing Act of 1988 purported to codify the informal housing program for Native Americans, admittedly its success was limited. Remarks from the House floor regarding the Native American Housing Assistance and Self–Determination Act of 1996 indicate that the impact of the 1988 Act was negligible. "This bill is truly historic. Indian housing programs are not the results of legislation, rather they represent a series of memos exchanged 30 years ago ...." 142 Cong. Rec. H.11603, 11613 (daily ed. Sept. 28, 1996) (remarks of Congressman Lazio).

**25.** Due to the climatic and geographic conditions associated with Indian reservations, private mortgages are almost impossible to obtain. The trust status of some Indian lands prohibits the mortgaging of property. The Homeownership Program "remains the only reasonable source of housing in many reservations ...." H.R.Rep. No. 100–604 (1988), *reprinted in* 1988 U.S.C.C.A.N. 791, 795 [hereinafter House Report].

**26.** These provisions have since been repealed. *See* Native American Housing Assistance and Self–Determination Act of 1996, Pub.L. No. 104–330, § 501(a), 110 Stat. 4016, 4041 (1996).

"provide lower income housing on Indian reservations and other Indian areas ...." 42 U.S.C. § 1437aa(a) (1988). At the time of its enactment, unless otherwise noted, it incorporated the provisions of the general Housing Act of 1937.[27] The general Housing Act defined "low-income housing" as "decent, safe, and sanitary dwellings." 42 U.S.C. § 1437a(b)(1). The legislation was viewed as marking "an important step towards enabling Native Americans to work with the Federal Government to obtain decent and affordable housing, to which all Americans are entitled." House Report at 793.

The Indian Housing Act also codified the Homeownership Program previously operated partly from HUD's regulations and partly from an Indian Housing Handbook. The Homeownership Program, of which Dewakuku is a participant, was considered "of special importance to the housing needs of Indian[s]" because it accounted for over sixty-five percent of the available housing in Indian Country. House Report at 793. It also represented the only reasonable source of housing on many reservations.

Under the Homeownership Program, an eligible Indian family makes an initial contribution of at least $1500 in land, cash, labor, or materials. *See* 42 U.S.C. § 1437bb(e)(1). The family enters into what is, in essence, a lease-purchase agreement for a period up to twenty-five years. During this time, the home buyer makes monthly payments based on income. *See* 42 U.S.C. § 1437bb(e)(2)(A)(i). In addition, the families are responsible for all utility costs and maintenance. *See* 42 U.S.C. § 1437bb(e)(3). The ownership contract differs from the lease agreement found in many public housing circumstances because a resident has an equitable interest in the property. The home buyer is required to contribute and invest in the ongoing development of the property.

The Homeownership Program was not only a vehicle to offer affordable home ownership to Native Americans, but Congress also viewed it as means to address "a wider variety of needs and problems." House Report at 795. "For example, on many reservations, younger and more affluent tribe members initially desire to remain on the reservation but leave because they are unable to obtain decent housing. Their departure robs the reservation of its most vital resource and destabilizes it economically." *Id.* Thus, the Homeownership Program also sought to maintain tribal community and economic stability—a policy that stands in bold contrast to those pursued during the Allotment and Assimilation Era and the Termination Era. In order to effectuate this policy, Congress eliminated the low-income requirement for certain participants on tribal lands. *Id.*

In addition, the Homeownership Program represented a device to continue to provide important services to the communities. "Indians also benefit greatly from the services of health workers, teachers and other non-Indian persons who provide services essential to the reservation .... These people are often willing to live on the reservation, but need decent housing." *Id.* Consequently, home ownership opportunities were extended to non-Indians who provided crucial aid to Indian communities.

To ensure the success of the Homeownership Program and to address impediments encountered in previous years, Congress required that HUD's property standards permit the use of traditional designs "so long as the products produced are cost-effective and structurally sound." House Report at 794. In addition, Congress insisted that the construction designs include "energy conservation and performance standards" so that residents did not incur "exorbitant utility costs as already has occurred causing many families to fall behind in their payments." *Id.* To ensure the homes met the applicable

27. No provisions of the general Housing Act enacted after 1988, however, would apply to housing in Indian areas unless explicitly stated. *See* 42 U.S.C. § 1437aa(b)(2).

standards, Congress anticipated that HUD would provide the necessary technical and supervisory assistance. *See id.* at 796.

Thus, the Indian Housing Act is more than a broad-based policy statement, it also reflects the federal government's recognition of, and commitment to, the obligations it adopted centuries ago.

It is against this historical and legislative backdrop that the Court examines the parties' contentions.

**B.  *Implied Cause of Action***

Dewakuku asserts that she is entitled to bring a private cause of action under the Indian Housing Act and implementing regulations.  The Secretary counters that the Indian Housing Act does not confer an enforceable cause of action on program participants.  Instead, he says that Dewakuku is an incidental beneficiary of his performance of his statutory duties.  The gravamen of this dispute centers on whether the Indian Housing Act creates an affirmative duty on the part of the Secretary to provide "safe, decent, and sanitary" housing to Native Americans in Indian Country.

**1.  *Sovereign Immunity***

Before the Court can consider the merits of Dewakuku's claims against the Secretary, there must be a waiver of sovereign immunity.  It is well established that the sovereign cannot be sued without its express consent. *See United States v. Mitchell,* 463 U.S. 206, 215, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).  Further, any waiver of sovereign immunity and consent to suit must be clearly expressed and strictly construed. *See United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969).

Dewakuku asserts that section 1404a of the Housing Act provides an express waiver of sovereign immunity. *See* 42 U.S.C. § .1404a.  Section 1404a provides that "[t]he Secretary of Housing and Urban Development may sue and be sued only with respect to its functions under the United States Housing Act of 1937 ...." *Id.* While the Secretary admits that section 1404a constitutes a waiver, he argues that the waiver does not extend to Dewakuku's claims under the Homeownership Program because the functions of the Secretary do not include legally enforceable duties.

To support this unique argument, the Secretary cites *North Side Lumber Co. v. Block,* 753 F.2d 1482 (9th Cir.1985).  While *North Side Lumber* states that sovereign immunity is a jurisdictional bar, *id.* at 1484 n. 3, it does not intimate that a court is precluded from determining whether a cause of action exists under a statute.  To adopt the Secretary's position would prevent a court from even assessing whether an implied cause of action exists under the Indian Housing Act. While section 1404a does not indicate that Congress intended to create a private right of action with respect to any particular provision of the Housing Act of 1937, it does demonstrate that Congress intended to waive its sovereign immunity with respect to those portions of that act for which a private cause of action may exist. *See Howard v. Pierce,* 738 F.2d 722, 727–28 (6th Cir. 1984); *Furtick v. Medford Housing Authority,* 963 F.Supp. 64, 72 n. 21 (D.Mass. 1997).

Therefore, this Court rules that section 1404a, as applied to Dewakuku's claim, is a waiver of sovereign immunity.  Whether or not an implied cause of action exists under the Indian Housing Act remains to be seen.

The government's consent to be sued is limited, of course, to funds appropriated to HUD and does not reach the general funds of the Treasury. *See DeRoche v. United States,* 2 Cl.Ct. 809, 812 (1983); *see also Little Earth of United Tribes, Inc. v. United States Dep't of Hous. and Urban Dev.,* 584 F.Supp. 1292, 1300 (D.Minn.1983) (section 1404(a) is not a waiver of sovereign immunity for money damages).

**2.  *The Governing Standard***

**a.  *Four-factor Test***

The Supreme Court set forth the standards for implication of a private right of action in the seminal case of *Cort v. Ash,* 422 U.S. 66, 75, 95 S.Ct. 2080, 45 L.Ed.2d

26 (1975). *See also Cablevision of Boston, Inc. v. Public Improvement Commission of the City of Boston,* 38 F.Supp.2d 46, 56 (D.Mass.1999) (considering *Cort v. Ash* factors). In order to determine if a statute implies a private right of action a court must examine: (1) whether the plaintiff is a member of the class for whose benefit the statute was enacted; (2) whether there is any indication of legislative intent to create or deny a remedy; (3) whether an implied remedy would be "consistent with the underlying purposes" of the statutory scheme; and (4) whether the cause of action implicates federal law. *Id.* at 78, 95 S.Ct. 2080.

In the years following *Cort,* the Supreme Court refined the four-part test and appeared to narrow its scope. *See Thompson v. Thompson,* 484 U.S. 174, 179, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15–16, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 569–70, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Cannon v. University of Chicago,* 441 U.S. 677, 717, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Specifically, the focal point of the test became to discern Congress' intent in enacting the statute at issue. *See Thompson,* 484 U.S. at 179, 108 S.Ct. 513. Thus, the four factors first announced in *Cort* became the appropriate means for determining congressional intent, rather than four distinct factors given equal weight. *See Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 535–36, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984).

The focus on congressional intent, however, does not require evidence that the drafters actually had in mind a private cause of action when enacting the statute. *See Thompson,* 484 U.S. at 179, 108 S.Ct. 513. According to the Supreme Court, to do so would result in the implied cause of action doctrine becoming a "virtual dead letter." *Id.* Instead, courts must look to the language of the statute, the statutory

structure, legislative intent, or some other source, to establish the essential predicate for the implication of a private remedy. *See Northwest Airlines, Inc. v. Transport Workers Union of Am.,* 451 U.S. 77, 94, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981).

The Ninth Circuit continues to apply the traditional four-factor *Cort* test, emphasizing two prongs in particular. *See Epstein v. MCA, Inc.,* 50 F.3d 644, 650 (9th Cir. 1995), *rev'd on other grounds by Matsushita Elec. Indus. Co., Ltd. v. Epstein,* 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) (grant of certiorari limited to full faith and credit question); *Puchall v. Houghton, Cluck, Coughlin & Riley,* 823 F.2d 1349, 1351 (9th Cir.1987). The focus is on whether "there is an implicit indication, in the statute's language, legislative history, or structure, of legislative intent to create a private remedy, and whether such an implication would be consistent with the underlying legislative scheme." *Epstein,* 50 F.3d at 650.

### b. *Indian Trust Doctrine*

The Indian Housing Act, however must be viewed through the canons of construction applicable in Indian law. Because of the unique legal status of Indians in American jurisprudence, legal doctrines must often be viewed from a different perspective. The federal government bears a special trust obligation to protect the interests of Indian tribes. *See County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 247, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985); *Native Village of Venetie I.R.A. Council v. State of Alaska,* 944 F.2d 548, 553 (9th Cir.1991).[28] "Federal law has long recognized that the United States government, in view of 'a distinctive obligation of trust incumbent upon [it] in its dealings with [the] dependent and sometimes exploited' Indian nations, 'has charged itself with moral obligations of the highest responsibility and trust.'" *Albuquerque Indian Rights v. Lujan,* 930 F.2d 49, 58 (D.C.Cir.

---

**28.** The Bureau of Indian Affairs Website describes the trust relationship as "an established legal and moral obligation requiring the United States to protect and enhance the property and resources of American Indian tribes." *Trust Responsibility* (visited June 30, 2000) <http://www.doi.gov/bia/trustterm. html>.

1991) (quoting *Seminole Nation v. United States*, 316 U.S. 286, 296–97, 62 S.Ct. 1049, 86 L.Ed. 1777 [1942]). The trust obligation extends not only to Indian tribes as governmental units, but to individual tribal members as well. *See Morton v. Ruiz*, 415 U.S. 199, 237–38, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). Consequently, statutes are to be construed in favor of the Indians and ambiguities are to be interpreted to the Indian's benefit. *See Montana v. Blackfeet Tribe*, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985).

One treatise on Indian law summarizes the impact of this relationship to agency action.

> [T]he federal trust responsibility imposes strict fiduciary standards on the conduct of executive agencies—unless, of course, Congress has expressly authorized a deviation from these standards .... Since the trust obligations are binding on the United States, these standards of conduct would seem to govern all executive departments that may deal with Indians .... Moreover, in some contexts the fiduciary obligations of the United States mandate that special regard be given to the procedural rights of Indians by federal administrative agencies.

*HRI, Inc. v. Environmental Protection Agency*, 198 F.3d 1224, 1245 (10th Cir.2000)(quoting Felix S. Cohen, *Handbook of Federal Indian Law* 225 [1982]).

The trust doctrine is broad and far-reaching, ranging from the protection of treaty rights to the provision of social welfare benefits. *See Busby School of the Northern Cheyenne Tribe v. United States*, 8 Cl.Ct. 596, 601 (1985) (Indian schools); *St. Paul Intertribal Hous. Bd. v. Reynolds*, 564 F.Supp. 1408, 1413 (D.Minn. 1983) (Indian housing); *Eric v. Secretary of the United States Dep't of Hous. & Urban Dev.*, 464 F.Supp. 44, 49 (D.Alaska 1978) (Indian housing). There is ample evidence in both congressional and judicial materials that the trust extends to the procurement of housing for Native Americans. *See e.g. Little Earth of United Tribes, Inc. v. U.S. Dept. of Housing and Urban Dev.*, 675 F.Supp. 497, 535 (D.Minn. 1987) (agreeing that trust obligation imposes affirmative duty upon HUD to act in best interests of American Indian people); *St. Paul*, 564 F.Supp. at 1413 ("HUD's own Indian Housing Programs are said to come within the scope of the trust doctrine"); *Eric*, 464 F.Supp. at 48 (holding that Bartlett Act, enacted to provide housing for Alaskan Natives, falls within the trust doctrine).

As already noted, the remarks on both the House and Senate floor indicate that Congress intended that the Indian Housing Act affirm the government's commitment to provide housing to Native Americans and recognize the "unique relationship between the U.S. Government and the Indian tribes." 134 Cong. Rec. H3055; 134 Cong. Rec. S7608. Further confirmation of the trust doctrine's applicability to Indian Housing is found in the Housing Commission Report. In describing the special trust relationship between the United States and American Indian tribes, the report states:

> This special relationship can be viewed as both legal and moral in nature. In the broadest sense, it obligates the federal government to protect Indian citizens pursuant to its fiduciary duties. More specifically, through a series of legislative enactments Congress has imposed numerous duties on the executive branch of the government. Among these is the duty to help procure decent, safe, and affordable housing for Native American families and individuals.

Housing Commission Report at xiv.

It is readily apparent that the Indian trust doctrine and its accompanying affirmative obligations are integrated into the Indian Housing Act. What is uncertain is what impact this has on the implied private right of action analysis.

3. *The Indian Housing Act: The Convergence of the Implied Right of Action Doctrine and Indian Law*

While an implied private cause of action under the Indian Housing Act is an

issue of first impression, implication of a private remedy under the general Housing Act of 1937 is not without precedent. The Supreme Court and several lower courts have held that tenants in low-income housing have private causes of action to enforce certain provisions of the Housing Act of 1937 against both the local housing authority and HUD. *See e.g., Wright v. City of Roanoke Redevelopment & Hous. Auth.,* 479 U.S. 418, 432, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987); *Howard v. Pierce,* 738 F.2d 722, 729 (6th Cir.1984); *Tinsley v. Kemp,* 750 F.Supp. 1001, 1008 (W.D.Mo. 1990); *Concerned Tenants Ass'n of Father Panik Village v. Pierce,* 685 F.Supp. 316, 320 (D.Conn.1988).

Although these cases are instructive, none of them involved the Indian Housing Act or the Indian trust doctrine. The Ninth Circuit, in *Native Village,* addressed whether a federal cause of action accrued under the Indian Child Welfare Act's full faith and credit clause. There, an Alaska native village and two members brought an action in federal court to compel Alaska to recognize a tribal court's decree of adoption under the Indian Child Welfare Act. Alaska argued, *inter alia,* that the Act did not give rise to a federal cause of action. *See Native Village,* 944 F.2d at 551.[29] To support its contention, Alaska cited *Thompson,* where the Supreme Court held that the full faith and credit clause of the Parental Kidnaping Act did not give rise to a private cause of action.

Although seemingly on point, the Ninth Circuit rejected Alaska's argument and de-clined to impose the holding of *Thompson* on the facts of the case before it, stating "Alaska errs, however, in seeking to impose upon Indian law doctrines from other fields of law." *Id.* 944 F.2d at 553. The court went on to highlight the "unique legal status of Indians in American jurisprudence." *Id.* With the doctrines of Indian law at the forefront, the court "[saw] no reason that Congress would not have intended to give Indian tribes access to federal courts ...." *Id.*

While the Ninth Circuit did not explicitly invoke the four-factor *Cort* test, it did review congressional intent to determine the existence of a private cause of action. The court reasoned that Congress' intent could be inferred from Congress' understanding of the law at the time the Act was passed.

> The intention of Congress can be gleaned, at least in part, by reference to prior law, as Congress is presumed to be knowledgeable about existing law pertinent to any new legislation it enacts. Thus, Congress can be presumed to know that statutes passed for the benefit of Indian tribes will be liberally construed in favor of such tribes .... If Congress did not seek to have such principles applied to the interpretation of the Indian Child Welfare Act, we presume that it would have said so.

*Native Village,* 944 F.2d at 554 (internal citations omitted). As further support for its conclusion, the court noted the lack of an adequate remedy within the Act stating "[w]e cannot conceive that Congress intended such a self-defeating result." *Id.*[30]

**29.** The plaintiffs in *Native Village* were attempting to bring a cause of action under the federal common law of the right of self-governance. To obtain the relief requested, the Ninth Circuit first had to determine if a federal cause of action accrued under the Indian Child Welfare Act's full faith and credit clause. According to the court, if Congress did not intend to permit tribes to sue in federal court under the Act then they could not obtain relief based on the right of self-governance. While that action is slightly different than the case at bar, it is helpful in navigating the turbulent waters of the Indian trust doctrine.

**30.** The Ninth Circuit's approach in *Native Village* appears to differ from the traditional approach in one important respect. Generally, when assessing congressional intent there is a presumption against an implied right of action. *See Stowell v. Ives,* 976 F.2d 65, 70 n. 5 (1st Cir.1992). Implicit in the Ninth Circuit's decision, however, is a presumption that, barring explicit language to the contrary,

An analysis of the Indian Housing Act begins with the presumption that Congress was aware that the "canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians" and that statutes are "construed liberally in favor of the Indians . . . ." *Native Village,* 944 F.2d at 553 (quotations omitted). There is nothing in the Indian Housing Act to suggest that this principle of construction does not apply to it. To the contrary, there is abundant evidence in the congressional record to sustain the conclusion that Congress passed the Indian Housing Act to fulfill its trust duty to Native Americans. *See* House Report at 795; 134 Cong. Rec. H3055; 134 Cong. Rec. S7608.

The Secretary contends that satisfaction of this trust duty is limited to money and minimal supervision while the implementation and oversight of the housing project is the responsibility of the Hopi Housing Authority. Dewakuku counters that HUD was in partnership with the Hopi Housing Authority and was required to provide both monetary and technical assistance as well as general oversight. Moreover, according to Dewakuku, the statute and regulations require HUD to play a more integral role in the construction of her home.

The contentions of the parties touch on the critical question in this analysis. Specifically, what are the duties of the Secretary pursuant to the Indian Housing Act and, more importantly, can Dewakuku enforce those duties through a private cause of action? It is at this juncture of the assay that the traditional implied cause of action analysis is impacted by the Indian trust doctrine.

Generally, the Supreme Court considers "right- or duty-creating-language" of a statute to be "the most accurate indicator of the propriety of implication of a cause of action." *Cannon,* 441 U.S. at 690 n. 13, 99 S.Ct. 1946. With this in mind, courts have implied causes of action based on a substantive provision of the Housing Act rather than on a provision which expresses

policy. *Compare Perry v. Housing Authority of City of Charleston,* 664 F.2d 1210, 1217 (4th Cir.1981) (concluding that section 1437 of the Housing Act of 1937, which expresses the congressional goal of remedying the shortage of decent, safe, and sanitary dwellings, does not provide a cause of action) *with Howard,* 738 F.2d at 726 (determining that provision of Brooke Amendment mandating a maximum rent creates an enforceable right).

Here, Dewakuku asserts that the Secretary has a duty to ensure the completion of decent, safe, and sanitary dwellings under the Indian Housing Act. Under the traditional implied cause of action analysis, the general Housing Act provisions which are broad declarations of housing policy, such as the procurement of decent, safe, and sanitary housing for low-income families, are not considered to contain the "right- or duty-creating-language" necessary to create an enforceable right. *See Furtick,* 963 F.Supp. at 71 (and cases cited therein). Based on the language, structure, and legislative history of the Housing Act of 1937, courts have concluded that Congress did not intend to create a private right of action under these provisions.

While the language on which Dewakuku relies is nearly identical to the language of the general Housing Act, the legislative history is significantly different. As already discussed, the Indian Housing Act was more than a codification of a broad policy, it was a recognition of the federal government's obligation to procure safe, decent, and sanitary housing for Native Americans. The congressional record is replete with references to the government's "commitment to provide housing in Indian areas" and acknowledgment that the new law "recognize[s] the unique relationship between the U.S. Government and the Indian tribes." This "unique relationship" creates affirmative duties and requires that the government act "to protect and enhance the people, the property, and the self-government of Indian Tribes." *St. Paul,* 564 F.Supp. at 1414 (concluding pro-

within the parameters of Indian law an im-

plied cause of action is presumed.

vision for housing well within trust doctrine); *see also Little Earth*, 675 F.Supp. at 535 (agreeing that trust doctrine requires HUD affirmatively to act to enhance Indian housing). Thus, the Indian Housing Act by its very existence creates a duty on the part of the government, and specifically HUD, to provide safe, decent, and sanitary housing to Native Americans.

Moreover, the regulations adopted by HUD indicate that the Secretary had more than a minimal oversight role in the procurement of housing in Indian areas.[31] HUD maintained oversight authority regarding every aspect of the Hopi Housing program, from approval of the Hopi Housing Authority's production method, 24 C.F.R. § 905.215(a) (1988), to site selection, 24 C.F.R. § 905.230 (1988), to the design chosen,[32] 24 C.F.R. § 905.250 (1988) to the development budget, 24 C.F.R. § 905.255 (1988). Indeed, prior to the start of construction, the Hopi Housing Authority was required to submit a development program to HUD. 24 C.F.R. § 905.255(a)(2) (1988). Upon receipt "HUD will review the IHA development program" and "advise the IHA of any defi-

ciencies and will provide the IHA with the opportunity to make corrections." 24 C.F.R. § 905.255(b) (1988). Thus, the construction of Dewakuku's home could not begin without HUD's prior approval, assuming that the Hopi Housing Authority plan met applicable program standards. These standards included the use of "structurally sound" materials and "cost-effective energy standards," House Report at 794, both obviously lacking in Dewaku-ku's home.

HUD's role in construction inspection also supports the conclusion that the Indian Housing Act creates enforceable rights. While construction inspections were to be performed by the Hopi Housing Authority, the frequency of the inspections and the architect, engineer, or other qualified inspector employed had to be approved by HUD to "assure completion of quality housing." 24 C.F.R. § 905.260(d). Approval of the completed project could only be made by HUD. 24 C.F.R. § 905.260(f)(1). Moreover, no funds could be released to a contractor without HUD's approval of the Certificate of Completion. 24 C.F.R. § 905.260(f)(2).[33]

31. A brief aside about HUD's involvement with Indian Housing contained in the Housing Commission Report suggests that HUD's oversight function has a significant impact on the quality of housing provided on reservations.

> HUD approved a 20–unit housing project for Walker River. Construction was to be based on the turnkey method of development, and HUD approved the use of manufactured housing units. The Walker River IHA tried to hire an architectural firm familiar with turnkey development but was discouraged by HUD because of budgetary restrictions. The IHA then hired a less-experienced architectural service to assist in design and preparation of the sites.... Immediately, the IHA began to have questions about the quality of construction. Apparently, the IHA, the architect, and HUD had unknowingly approved units manufactured according to a less stringent set of standards ....
>
>     \*    \*    \*    \*    \*    \*
>
> Hampered, by budgetary constraints, insufficient training, and lack of information, the IHA had done its best only to discover that it had obtained, in conjunction with HUD,

> completely substandard housing for its population. HUD, on its side, had not only failed to provide the oversight necessary but had also forced the IHA to settle for inexperienced technical assistance.
>
> *Housing Commission Report at xi-xii, xiii.*

32. The effect of these regulations are well articulated by Congressman Young of Alaska during the debate on the Native American Housing Assistance and Self–Determination Act of 1996. "I have watched the present program in housing not work. We have had housings in Alaska that were under Government control that had such audacity to say you could not put up a storm porch in Nome, AK, on federally built housing because it did not meet their code or did not meet their design. I do not know how many have been to Nome, AK, but the wind blows about 84 miles an hour off the Bering Sea." 142 Cong. Rec. H11603 (daily ed. Sept. 28, 1996).

33. HUD's control over funds for Indian housing under the Indian Housing Act of 1988 stands in sharp contrast to the block grants provided in the Native American Housing Assistance and Self–Determination Act of 1996.

More importantly, the regulations anticipated costs related to the correction of design and construction defects. *See* 24 C.F.R. § 905.270. Program funds could be used to correct deficiencies in "design, construction and equipment" with HUD's approval. Although the Hopi Housing Authority first had to pursue the "responsible parties" prior to seeking HUD's assistance, the regulations allow for amendments of the development budget or the Contributions Contract to provide the amounts needed to make the corrections. *See* 24 C.F.R. § 905.270(a)-(d). Thus, HUD foresaw and provided for correction costs. There is nothing in the regulations or the statute to indicate that the Hopi Housing Authority has the sole responsibility for the corrections beyond the initial pursuit of the responsible parties. Indeed, the regulations suggest that HUD is a necessary participant in the correction process.

Most telling of legislative intent, however, is that without an implied private right of action in the Indian Housing Act Dewakuku has no adequate remedy. *See Native Village*, 944 F.2d at 553. The lack of an adequate remedy has been an important factor in implied right of action cases outside the Indian law arena as well. *See Wright*, 479 U.S. at 424-25, 107 S.Ct. 766.

The Secretary suggests that the appropriate course for Dewakuku is to bring an action against the Hopi Housing Authority. The Secretary's position ignores the realities of the Hopi Housing Authority's existence. The Hopi Housing Authority is not a private, for-profit corporation with access to alternative funds or private capital. It was created to administer the public housing monies received from HUD. HUD funds are the sole source of financing for the Indian Housing Authority. *See* Hous-

ing Commission Report at 31. Moreover, Congress recognized the lack of private funding available on Indian reservations when it codified the Homeownership Program. *See* House Report at 795 (noting that because of impossibility of obtaining private mortgages, home ownership program is only available source of housing on Indian reservations). It would thus be ironic indeed had Congress permitted suits only against the Hopi Housing Authority. That is no remedy at all. Like the Ninth Circuit in *Native Village*, this Court "cannot conceive that Congress intended such a self-defeating result." 944 F.2d at 554.

Focusing on whether "there is an implicit indication, in the statute's language, legislative history, or structure, of legislative intent to create a private remedy, and whether such an implication would be consistent with the underlying legislative scheme," *Epstein*, 50 F.3d at 650, this Court concludes that an implied private right of action exists under the Indian Housing Act. The unique trust relationship between the federal government and Native Americans mandates that HUD itself procure decent, safe, and sanitary housing in Indian areas under the Indian Housing Act of 1988. This conclusion is buttressed by the congressional record and the responsibilities adopted by HUD in its regulations.

Accordingly, this Court declares that Dewakuku has a private right of action in which she can enforce HUD's affirmative duty—once it has undertaken an Indian Housing Act project—to ensure that it results in the provision of decent, safe, and sanitary housing in Indian areas under the Indian Housing Act of 1988. The Secretary's duty is, however, limited to requiring that such program funds as may re-

---

*See* Pub.L. No. 104-330, 110 Stat. 4016 (1996). Congress recognized the limitations placed on the Indian Housing Authorities under the 1988 Act. To alter the power imbalance, Congress "block-grant[s] that money directly to the Indian tribes so they do not have to come through the Washington bureaucracy, so they do not have to wait for set-

asides from respective State governments. We say to the first Americans in this instance, 'You are not the forgotten Americans, and moreover, you have the right to self-determination, to self-governance, to decide how best to spend this money.' " 142 Cong. Rec. H11603 (daily ed. Sept. 28, 1996) (remarks of Congressman Hayworth).

main be used to correct the deficiencies in Dewakuku's housing. The Secretary must also apply such unobligated funds as may be found in HUD's budget to remedying this breach of duty. 24 C.F.R. § 905.270(a)-(d).

### C. *Breach of Contract*

Dewakuku advances a second argument which she conceives may give her a general claim against the United States Treasury. She contends that she is an intended third party beneficiary to the Contributions Contract between the Hopi Housing Authority and HUD and, as a result, can enforce the Housing Authority's contractual rights. Dewakuku requests that this Court issue an order awarding her incidental and consequential damages suffered as a result of the Secretary's breach. Not surprisingly, the Secretary counters that this Court lacks subject matter jurisdiction and, in any event, Dewakuku is not an intended beneficiary of the Contributions Contract.

### 1. *Sovereign Immunity*

Before untangling the contract issue, however, the Court must first determine whether it has jurisdiction to address this claim. While section 1404(a) of the Housing Act waived sovereign immunity for purposes of determining whether an implied cause of action under the Indian Housing Act existed, this waiver does not extend to contractual claims against the government. Thus, there must be a distinct, explicit waiver of sovereign immunity.

The Tucker Act waives sovereign immunity and permits suit "upon any express or implied contract with the United States ...." 28 U.S.C. § 1491(a)(1). The Court of Federal Claims has exclusive jurisdiction when claims exceed $10,000. Under the Little Tucker Act, the federal district courts and the Court of Federal Claims have concurrent jurisdiction over actions less than $10,000. *See* 28 U.S.C. § 1346(a)(2). Case law establishes that, where a plaintiff waives money damages over $10,000, as Dewakuku has done here,

she may properly bring a federal contract suit in district court. *See Zumerling v. Devine,* 769 F.2d 745, 748 (Fed.Cir.1985). Thus, the claim under the Contributions Contract is properly before this Court.

### 2. *The Contract*

The burden is on Dewakuku to establish that she is an intended third party beneficiary of the contract. To that end, she points to explicit language in the contract and companion case law interpreting identical or similar contractual language as affording tenants in low-income housing projects intended third party beneficiary status.

In deciding whether Dewakuku is an intended or incidental beneficiary of the Contributions Contract, the Court must first determine whether state or federal common law applies. *See Miree v. DeKalb County,* 433 U.S. 25, 29, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Aristil v. Housing Authority of the City of Tampa, Fla.,* 54 F.Supp.2d 1289, 1295 (M.D.Fla.1999). The Supreme Court has explained that "federal common law may govern ... where a uniform national rule is necessary to further the interests of the Federal Government ...." *Miree,* 433 U.S. at 29, 97 S.Ct. 2490. Moreover, federal common law applies to third party beneficiary claims when a federal agency is a party to the action and the outcome may directly affect financial obligations of the United States. *See United States v. Standard Oil Co.,* 332 U.S. 301, 304, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947). State law controls over federal common law where "the litigation ... raises no question regarding the liability of the United States or the responsibilities of the United States under the contracts." *Miree,* 433 U.S. at 28–29, 97 S.Ct. 2490.

Here, the Indian Housing Act authorizes HUD, a federal agency, to enter into a Contributions Contract with the Hopi Housing Authority. *See* 42 U.S.C. § 1437bb(b)(1) (1988). The language of the contract makes clear that it is "be-

tween the United States of America, Acting by and through the Department of Housing and Urban Development" and the Hopi Housing Authority. Def.'s Ex. 6 at 1. Because a claim based on the Contributions Contract implicates the United States' responsibilities under a contract, it has an interest in establishing a uniform rule regarding third party beneficiaries. *See Price v. Pierce*, 823 F.2d 1114, 1121–23 (7th Cir.1987); *Holbrook v. Pitt*, 643 F.2d 1261, 1269–73 (7th Cir.1981); *Aristil*, 54 F.Supp.2d at 1295. Thus, this Court rules that federal common law applies.

A third party has enforceable rights under a contract if the contract was made for her direct benefit. *See Crumady v. Joachim Hendrik Fisser*, 358 U.S. 423, 428, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); *Williams v. Fenix & Scisson, Inc.*, 608 F.2d 1205, 1208 (9th Cir.1979); *Holbrook*, 643 F.2d at 1270. The purpose of the Contributions Contract is described as "to provide low income families with an opportunity to become homeowners in return for each family's agreement to make a minimum contribution toward the Development Cost ...." Def's Ex. 6 ¶ 0.1. According to Dewakuku, the language of the Contributions Contract evidences that it was written solely to benefit the Hopi Homebuyers:

> The IHA shall at all times develop and operate each Project (1) solely for the purpose of providing decent, safe and sanitary Homes ... (2) in such manner as to promote serviceability, efficiency, economy, and stability, and (3) in such manner as to achieve the economic and social wellbeing of the Homebuyers.

*Id.* ¶ 0.2(d). Thus, the procurement of safe, decent, and sanitary housing for Native American families and individuals, like Dewakuku, was the motivating cause behind the Contributions Contract.

This conclusion is bolstered by the previous discussion regarding the statutory history and regulatory scheme. *See Busby School of Northern Cheyenne Tribe v. United States*, 8 Cl.Ct. 596, 602 (1985) (Native Americans able to show they were intended third-party beneficiaries of contract between School Board and Bureau of Indian Affairs "given the pertinent statutes and regulations and the underlying policy behind the contracts and applicable statutes and regulations"). As already noted, Congress recognized the desperate need for affordable and decent housing for Native Americans. *See* House Report at 791. To ensure that the need was met, Congress authorized the Secretary to "enter into contracts with Indian housing authorities ...." 42 U.S.C. § 1437bb(b)(1). Dewakuku's argument is compelling.

Although the Ninth Circuit has not ruled upon the intended third party beneficiary issue in the context of the general Housing Act, other courts have ruled, in analogous situations, that the Contributions Contract provides enforceable rights for tenants. *See Ashton v. Pierce*, 716 F.2d 56, 66 (D.C.Cir.1983); *Holbrook*, 643 F.2d at 1271; *Henry Horner Mothers Guild v. Chicago Housing Authority*, 780 F.Supp. 511, 515–16 (N.D.Ill.1991); *Tinsley v. Kemp*, 750 F.Supp. 1001, 1008 (W.D.Mo. 1990).

In *Holbrook*, the court relied on the legislative history and purpose of the Section 8 program, HUD's implementing language, and the contract terms to determine that tenants of Section 8 housing had enforceable rights under the contract. *See* 643 F.2d at 1271 n. 18. According to the Seventh Circuit, HUD's position to the contrary

> Displays an astonishing lack of perspective about government social welfare programs. If the tenants are not the primary beneficiaries of a program designed to provide housing assistance payments to low income families, the legitimacy of the multi-billion dollar Section 8 program is placed in grave doubt.

*Id.* at 1271.

The District of Columbia Circuit made a similar observation in *Ashton* when it stated:

We are convinced that the Annual Contribution Contract between the Department and the Authority affords appellees a legal basis for enforcing any duties inhering in the Contract. The mutual promises contained in the Contract were intended by the parties to benefit appellees. Indeed, it is difficult to imagine any purpose for the Contract other than to benefit the tenants of public housing.

716 F.2d at 66 (citation omitted).

The District of Alaska, in an unpublished opinion, relied on the decision in *Ashton* to support a ruling that Alaskan Natives were third party beneficiaries to a Contributions Contract between HUD and a Housing Authority. *See Ungott v. Watt,* N82–004 CIV, slip op. at 6–7 (D.Alaska 1984). Like Dewakuku, the plaintiffs' homes in *Ungott* were built as part of the Home-ownership Program, although prior to its official codification in 1988. *See id.* at 2. Like Dewakuku's home, the plaintiffs alleged that the houses they received suffered from serious design and structural defects. *See id.* at 4. The court concluded "there is no doubt that the prime purpose of the [Contributions Contract] was to benefit the lessee-home buyers, such as plaintiffs." *Id.* at 8.

The sections of the Contributions Contract cited by Dewakuku are not the only sections pertinent to the Court's analysis, however. The Secretary points to an equally compelling portion of the contract to support his argument that no contractual rights are conferred. Section 14.6 provides that "[n]othing in the [Contributions Contract] shall be construed as creating or justifying any claim against HUD by any third party." Def.'s Ex. 7 at 57.

As language of the contract evidences, Dewakuku has a significant obstacle to overcome. Courts are generally required to rely on the plain meaning of a contract. In this instance, the contract clearly states that it does not create or justify any third party claims. The Secretary points to this language, as he should, to support his contention that Dewakuku cannot bring a breach of contract claim.

To back his argument, the Secretary cites to what he believes is the "sole case construing this provision," *Blaze Constr. Inc. v. United States,* 27 Fed. Cl. 646 (1993).[34] The case is, however, neither especially persuasive nor on point. The plaintiff, a contractor, sued the government for breach of the Contributions Contract because the Nez Perce Tribal Housing Authority breached its contract with him. *See id.* at 648. Apparently there was a dispute between the Housing Authority and the contractor regarding the amount owed and the Tribal Court ordered the Housing Authority to withhold payment until the dispute was resolved. *See id.* at 649. In concluding that the plaintiff did not have third party rights to force HUD to pay the amounts owed, the court relied on a variety of contract terms as well as the presumed "validity of the proceedings of [the] Tribal Court." *Id.* at 653–54. Section 14.6, *in combination with other factors* leads "to the conclusion that the parties intended that no third-party rights be conferred." *Id.* at 654.

Other courts that have examined third-party beneficiary rights under Contributions Contracts that contain a disclaimer such as section 14.6, have looked beyond the contract terms to determine whether the tenants have enforceable rights. *See*

**34.** The Secretary also relies on this case to argue that Dewakuku fails to meet the two-prong test to establish third-party beneficiary status. This argument is rejected by the Court. The second prong of the analysis, that "[t]he contract must also reflect the intention of the parties to give the claimant 'the direct right to compensation or to enforce that right against the promisor,'" *Blaze,* 27 Fed. Cl. at 652, has been abolished in these circumstances by subsequent case law. *See Schuerman v. United States,* 30 Fed. Cl. 420, 430 (1994). Thus, the Court's examination is limited to whether the "contract in question was intended to specifically benefit the party claiming third-party beneficiary status." *Id.; see also Maniere v. United States,* 31 Fed. Cl. 410, 418 (1994) (agreeing with the analysis and conclusions presented in *Schuerman* ).

*Ashton,* 716 F.2d at 66; *Aristil,* 54 F.Supp.2d at 1295. The *Aristil* court noted "[w]hen determining whether a plaintiff is an intended beneficiary of [a Contributions Contract], the court must consider the intent of the parties to the contract, 'which is evinced in part in the language and legislative history pursuant to which the [Contributions Contract] was executed.'" 54 F.Supp.2d at 1295 (quoting *Concerned Tenants Ass'n of Father Panik Village v. Pierce,* 685 F.Supp. 316, 323 [D.Conn.1988]). The court, "after considering the legislative history and the language of the [Lead–Based Paint Poisoning Prevention Act], the [Housing Act], and the [Contributions Contract]," concluded that the tenants were not third party beneficiaries and, therefore, lacked standing. *Id.* at 1296.

Likewise, the court in *Ashton* examined congressional intent to determine whether tenants of public housing had enforceable rights under a Contributions Contract. *See* 716 F.2d at 66–67. HUD argued, as the Secretary does here, that a provision of the contract that provided "[n]othing in this contract contained shall be construed as creating or justifying any claim against the Government by any third party" prevented the tenants from establishing beneficiary status. *Id.* at 67. The court disagreed.

> Although the rights of third-party beneficiaries to a contract are derived from, and limited by, the terms of the contract ..., we find no evidence that the parties intended section 510(B) to apply to tenants. Assuming that the parties can contract away the third-party beneficiary's right to enforce the contract, the intention to do so must be more clearly expressed than it is in section 510(B). Thus, appellees have the right to compel the Department to perform its duties under the Contract.

*Id.* at 66 (citation omitted). The District of Columbia Circuit concluded that "Congress obviously envisioned that the Department itself would be responsible" under the contract and, as a result, the

tenants had enforceable rights. *Id.* at 67.

The court in *Ungott* relied on the analysis in *Ashton* when it concluded that Native Alaskans were third-party beneficiaries to a contract between HUD, the Bureau of Indian Affairs, and the local housing authority. *See Ungott,* N82–004 CIV, slip op. at 6. Like the Contributions Contract here, the contract at issue in *Ungott* contained a clause denying claims against the government by third parties. *See id.* The District of Alaska succinctly stated its reasoning:

> Such a clause potentially operates to bar suits by either tenants or contractors, ... and thus it is not clear that the clause is intended to apply to tenants. This ambiguity is magnified when the "no suits" clause is viewed in the context of the [Contributions Contract] as a whole. The whole thrust of the contract is to assure that tenants have decent, safe, and sanitary housing. Additionally, the contract must be considered against the backdrop of the United States Housing Act of 1937 .... The court will not lightly presume that the parties intended, with one hand, to create a lease-sale program so that Natives could have decent housing, and, with the other hand, take away any remedy that the Natives might have to cure defective housing and thus make a mockery of the whole program.

*Id.* at 7 n. 3. The reasoning in *Ungott* applies with equal, if not stronger, force in this case. In *Ungott,* Congress had not yet passed the Indian Housing Act. Now Dewakuku has the benefit of an explicit congressional mandate.

It is evident from the case law that section 14.6 cannot be viewed in isolation rather it must be "considered against the backdrop" of the Indian Housing Act and legislative history. The previous discussion regarding congressional intent demonstrates that Dewakuku is an intended third-party beneficiary of the contract between the Housing Department and the

Hopi Housing Authority. Section 14.6 does not clearly manifest an intent to divest her of her rights under the contract. As a result, Dewakuku can sue HUD to enforce its duties under the contract to provide safe, decent, and sanitary housing.

This Court does not hold, however, that consequential damages are available from the government. Instead, Dewakuku's remedy is limited to her right to demand a cure of the breach. Namely, the Housing Department must correct the defects in her home so that it meets the applicable standards required for safe, decent and sanitary housing.

## IV. *Conclusion*

Based on the foregoing, this Court holds that Dewakuku's Motion for Summary Judgment as to Count I (Violation of the Indian Housing Act) and Count II (Breach of the Contributions Contract) be GRANTED [Docket No. 26–1]. Because the relief afforded under Count III (Violation of the Administrative Procedure Act) is duplicative of the relief already awarded, the Court does not address that claim. This Court rules that the Secretary has failed to meet his obligations under the Indian Housing Act of 1988 and the Contributions Contract to provide Dewakuku with a decent, safe, and sanitary home. The Secretary is hereby ordered to cure the defects in the design and construction of Dewakuku's home to the extent there are funds available under 24 C.F.R. § 905.270(a)-(d), or to the extent the Secretary has other unobligated funds in HUD's budget, or to the amount of $10,000.00, whichever sum shall be the greatest.

Dewakuku's request for money damages is DENIED.