**Serena DEWAKUKU, Plaintiff–Appellee,**

v.

**Mel R. MARTINEZ, Secretary of Housing and Urban Development, Defendant–Appellant.**

No. 00–1587.

United States Court of Appeals, Federal Circuit.

Nov. 5, 2001.

Samuel D. Gollis, Williams, Janov & Conney, P.C., of Albuquerque, NM, argued for plaintiff-appellee.

Charles W. Scarborough, Attorney, Appellate Staff, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief was Mark B. Stern, Attorney.

Before MAYER, Chief Judge, RADER, and LINN, Circuit Judges.

LINN, Circuit Judge.

The Secretary of Housing and Urban Development ("HUD" or the "Secretary") appeals the decision of the United States District Court for the District of Arizona granting Serena Dewakuku's ("Dewakuku") summary judgment motion that HUD (1) violated the Indian Housing Act of 1988 ("IHA") (codified at 42 U.S.C. §§ 1437aa–1437ff (1994), *repealed by* Native American Housing Assistance and Self Determination Act of 1996, Pub.L. No. 104–330, § 501(a), 110 Stat. 4016, 4041 (1996)), and its implementing regulations and (2) breached its obligations under the Annual Contributions Contract ("ACC") to Dewakuku as an intended third party beneficiary of that contract. *Dewakuku v. Cuomo*, 107 F.Supp.2d 1117 (D.Ariz. 2000). The first issue turns on whether Dewakuku has an implied private right of action against the Secretary under the IHA. The second issue turns on whether Dewakuku is an intended beneficiary of the ACC. While we agree that Congress waived the Secretary's sovereign immunity under 42 U.S.C. § 1404a (1994), we nevertheless conclude that the IHA does not create an implied right of action against the Secretary. We also conclude that Dewakuku is not a third party beneficiary of the ACC. Therefore, we reverse the district court on both issues and remand.

## BACKGROUND

A brief description of the regulatory setting of this case provides the backdrop for the discussion that follows. In 1962, the Public Housing Administration, the precursor to HUD, determined that the United States Housing Act of 1937, codified at 42 U.S.C. §§ 1437–1437x (1994) (the "Housing Act"), which was developed to help Americans find decent, safe, and sanitary living conditions, authorized low-rent housing programs on Indian lands. This determination led to the development of the Mutual Help Homeownership Program ("MHH Program")—designed to meet the homeownership needs of low-income Indian families on Indian reservations and other Indian areas.

Prior to 1988, the MHH Program was operated through administrative directives and regulations rather than through any specific statutory provisions. The operations changed with the passing of the IHA, which provided statutory authority for the MHH Program to be carried out by HUD. Pursuant to its statutory authority, HUD issued implementing regulations for the MHH Program. 24 C.F.R. § 905 (1991).

Under the MHH Program, eligible Indian family homebuyers desiring to take advantage of the program enter into a contract (called a "Mutual Help and Occupancy Agreement," 42 U.S.C. § 1437bb(e)), with the relevant Indian housing authority establishing the rights

and duties of individual homebuyers. The homebuyer makes an initial contribution of at least $1500 in land, cash, labor, or materials. 42 U.S.C. § 1437bb(e)(1) (1994). The family then enters into what is, in essence, a lease-purchase agreement, for a period of up to twenty-five years. During this time, the homebuyer makes monthly payments based on income and pays for all utility costs and maintenance. *Id.* §§ 1437bb(e)(2)(A)(i), 1437bb(e)(3).

To overcome impediments encountered in previous years, Congress also required that HUD's property standards permit the use of traditional Indian designs "so long as the products produced are cost-effective and structurally sound." H.R.Rep. No. 100–604 (1988), *reprinted in* 1988 U.S.C.C.A.N. 791, 794 ("House Report"). In addition, Congress insisted that the construction designs include "energy conservation and performance standards" so that homeowners did not incur "exorbitant utility costs as already has occurred causing many families to fall behind in their payments." *Id.* Finally, because the IHA is a subchapter of the Housing Act, the IHA requires that all low-income housing built under the MHH Program be "decent, safe, and sanitary." 42 U.S.C. §§ 1437a(b)(1), 1437aa(a) (1994).

To get housing built on tribal lands under the MHH Program, HUD's regulations "permit" a tribal government to create an Indian Housing Authority. 24 C.F.R. §§ 905.108(a), 905.109 (1990). HUD would then make grants to, and enter into ACCs with Indian public housing authorities "to provide financial assistance for the development, acquisition, operation and improvement of [public] housing projects." 42 U.S.C. § 1437bb(b) (1994). HUD would not enter into an ACC unless the tribal ordinance creating the housing authority is submitted to and

approved by HUD. 24 C.F.R. § 905.109 (1990). The Indian public housing authorities in turn were to develop, own, and operate the housing projects under HUD's supervision and in accordance with HUD regulations.

Dewakuku, a member of the Hopi Indian Tribe, purchased a home built by the Hopi Tribal Housing Authority ("HTHA") between September 1990 and August 1991 under a contract with HUD. Dewakuku and her family moved into the home in September 1991. It is undisputed that there are serious defects in Dewakuku's home, resulting from structural and design problems, shoddy workmanship, and the use of poor quality building materials. Dewakuku reported these defects to the HTHA, who did not make any of the requested repairs. Dewakuku then filed suit against HUD. Dewakuku alleged in her suit that HUD (1) violated the IHA and its implementing regulations; (2) breached its obligations to Dewakuku under the ACC as its intended beneficiary; and (3) violated the Administrative Procedure Act ("APA") by failing to enforce the standards and perform its duties.

The district court granted summary judgment for Dewakuku concluding that section 1404a of the Housing Act extended to the Secretary's functions under the MHH Program and that to the extent that a private cause of action existed with respect to those functions, section 1404a waived the Secretary's immunity from suit. The district court then concluded that Dewakuku was entitled to bring a private right of action against HUD under the IHA and that she was entitled to sue HUD for breach of contract under the Little Tucker Act, 28 U.S.C. § 1346 (1994), as a third party beneficiary of the ACC. The district court declined to address Dewakuku's APA claim because it determined that such request for relief was duplicative of

her other claims. The district court awarded Dewakuku the declaratory and injunctive relief she sought regarding HUD's statutory and regulatory responsibilities as to the development, design, and construction of her home, but denied her claim for money damages against HUD for breach of the ACC.

The Secretary appeals to this court. We have jurisdiction over the Secretary's appeal from the district court's final decision pursuant to 28 U.S.C. § 1295(a)(2) (1994).

## DISCUSSION

### A. Standard of Review

■ This court has exclusive appellate review of federal district court cases where jurisdiction is "based in whole or in part" on 28 U.S.C. § 1346 (1994), which gives the district courts concurrent jurisdiction with the Court of Federal Claims over Tucker Act claims not exceeding $10,000. *Ysasi v. Rivkind,* 856 F.2d 1520, 1525 (Fed.Cir.1988). We review the district court's determination on the Little Tucker Act claim, that Dewakuku was an intended third party beneficiary of the ACC, under the law of this circuit. This court "employs complete and independent review over an appeal of the propriety of summary judgment [on a third party contract claim], construing the facts in a light most favorable to the non-movant." *Montana v. United States,* 124 F.3d 1269, 1273 (Fed.Cir.1997). Contract interpretation is a question of law, which we review de novo. *Cienega Gardens v. United States,* 194 F.3d 1231, 1239 (Fed.Cir.1998).

### B. Analysis

#### I. Sovereign Immunity

■ Before this court considers the substantive claims of error asserted by the Secretary, we address the Secretary's contention that HUD cannot be sued under the IHA because the MHH Program was repealed in 1996. According to the Secretary, because the MHH Program was repealed, there are no appropriated funds to pay out on any claims having to do with this program. Thus, argues the government, Dewakuku has no avenue for recovery in this case.

■ It is well-established that the United States may not be sued without its express consent and that the existence of such consent is a prerequisite for jurisdiction of federal courts. *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). The district court found in 42 U.S.C. § 1404a an unequivocal waiver of the Secretary's sovereign immunity regarding Dewakuku's claim. The district court also found that section 1404a limits the government's liability to funds appropriated to HUD and does not reach the general funds of the Treasury.

■ Section 1404a provides that "[t]he Secretary of Housing and Urban Development may sue and be sued only with respect to its functions under the United States Housing Act of 1937, as amended. . . ." As the district court recognized, this section demonstrates that Congress intended to waive the Secretary's sovereign immunity for those portions of the Housing Act for which a private cause of action may exist. Moreover, because the IHA amended Title II of the Housing Act, 24 C.F.R. § 905.101(a) (1991), HUD's administration of the MHH Program is a function under the Housing Act within the section 1404a waiver. The next question is whether HUD's waiver is limited in this case due to a lack of appropriated funds.

As noted at the outset, HUD contends that because the MHH Program has been repealed, Dewakuku has no basis for recovery in the district court. However,

whether appropriated MHH Program funds are available to satisfy any judgment in this case is not dispositive. The crucial determination is whether a judgment for damages would be satisfied from funds under HUD's control or, instead, from general treasury revenue funds. *See Falls Riverway Realty, Inc. v. City of Niagara Falls, N.Y.,* 754 F.2d 49, 56 (2d Cir.1985) (citing *Fed. Housing Admin. v. Burr,* 309 U.S. 242, 250, 60 S.Ct. 488, 84 L.Ed. 724 (1940); *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), and noting that in a suit against the government filed in a district court of competent jurisdiction, if judgment for damages is satisfied from funds under HUD's control then a valid waiver of HUD's sovereign immunity exists).

There is nothing in the Constitution, Supreme Court jurisprudence, or our jurisprudence that requires that only money appropriated to specific programs of a specific agency can be used in satisfaction of claims against that agency. *See* Art. 9 § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."); *Office of Pers. Management v. Richmond,* 496 U.S. 414, 424, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) ("Money may be paid out only through an appropriation made by law; in other words, the payment of money from the Treasury must be authorized by statute."); *Burr,* 309 U.S. at 250–51, 60 S.Ct. 488 (noting that those funds which have been paid over to the Federal Housing Administration in accordance with provisions of the National Housing Act and which are in its possession, severed from Treasury funds and Treasury control, are subject to being paid out in execution of a judgment against the Administration). Here, while the MHH Program has in fact been abolished, HUD continues to have funds appropriated to it by Congress that are "severed from Treasury funds and

Treasury control ." These funds may be used to satisfy any judgment in this case. Consequently, HUD's consent to suit has not been limited in this case due to the repeal of the MHH Program. Thus, we agree with the district court that section 1404a constitutes a valid waiver of sovereign immunity in this case.

## II. Avenues of Relief

■ In addition to determining whether Congress waived the Secretary's sovereign immunity, we must also explore the "analytically distinct" inquiry "whether the source of substantive law upon which the claimant relies provides an avenue of relief." *FDIC v. Meyer,* 510 U.S. 471, 484, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) (citing *Mitchell,* 463 U.S. at 216–18, 103 S.Ct. 2961). We thus turn our attention now to the Secretary's assertions that there is no substantive right of action under the IHA and that Dewakuku was not an intended beneficiary of the ACC.

### a. Private Right of Action

■ The Secretary contends that even if Dewakuku's claim under the IHA fell within the limited waiver of HUD's immunity in section 1404a, Congress did not provide a private right of action to Dewakuku in the IHA. A private right of action to enforce federal law must be created by Congress. *Alexander v. Sandoval,* 531 U.S. 1049, 121 S.Ct. 1511, 1519, 149 L.Ed.2d 517 (2001). While congressional intent is the key in determining whether a private right of action exists, neither the statute nor the legislative history needs to expressly declare the existence of such a right for a court to determine that Congress has in fact created one. *Id.; Thompson v. Thompson,* 484 U.S. 174, 179, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988) ("The implied cause of action doctrine would be a virtual dead letter were it limited to correcting drafting er-

rors when Congress simply forgot to codify its evident intention to provide a cause of action."). When the statute does not expressly provide for a private right of action, the question of whether such an action can be implied from a federal statute requires courts to look to congressional intent. *Alexander,* 121 S.Ct. at 1519–20; *Thompson,* 484 U.S. at 179, 108 S.Ct. 513. Thus, in the case where no explicit declaration of a private right of action is found in the legislative history, courts should focus on whether an intent to create such a private right by Congress is nonetheless implicit. *Id.* (noting that Congress' "intent may appear implicitly in the language or structure of the statute, or in the circumstances of its enactment"); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 18, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Northwest Airlines, Inc. v. Transp. Workers,* 451 U.S. 77, 94, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981).

As guides to discerning Congress' intent as to an implied private right of action, courts generally look to the four factors enunciated by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).[1] *E.g., Thompson,* 484 U.S. at 179, 108 S.Ct. 513; *Northwest Airlines,* 451 U.S. at 91, 101 S.Ct. 1571; *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568–83, 99 S.Ct. 2479, 61 L.Ed.2d 82

(1979); *Cannon,* 441 U.S. at 689, 99 S.Ct. 1946. However, the *Alexander* Court recently stated that courts are not "to provide such remedies as are necessary to make effective the congressional purpose expressed by a statute," because such an approach goes beyond Congress' intent. 121 S.Ct. at 1520 (internal quotations and citations omitted). Furthermore, unlike cases where an implied private right of action is found against a non-government defendant, courts consistently refuse to imply a private right of action against the government when the statute or legislative history is silent on the subject. *Cf. Block v. North Dakota,* 461 U.S. 273, 287–88, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983) (finding no congressional intent in statute or legislative history to exempt states suing federal government from a statute of limitations condition attached to an immunity waiver); *United States v. King,* 395 U.S. 1, 5, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) (refusing to find Declaratory Judgment Act jurisdiction at Court of Claims "absen[t] an express grant of jurisdiction from Congress"); *United States v.. Sherwood,* 312 U.S. 584, 590, 61 S.Ct. 767, 85 L.Ed. 1058 (1941) ("relinquishment of a sovereign immunity ... must be strictly interpreted").

42 U.S.C. § 1437 of the Low–Income Housing Act states that

It is the policy of the United States-

---

**1.** These factors are: (1) whether the language of the statute and its structure sets forth a specific class of beneficiaries and whether Congress intended to confer federal rights upon those beneficiaries; *see e.g., California v. Sierra Club,* 451 U.S. 287, 289, 294, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981) (noting that a general proscription of certain activities, such as prohibiting "[t]he creation of an obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States," does not focus on any particular class of beneficiaries whose welfare Congress intended to further); *Cannon v. University of Chicago,* 441 U.S. 677, 681, 690, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (noting

that 20 U.S.C. § 1681, which states that "[n]o person in the United States shall, on the basis of sex, ... be subjected to discrimination under any education program or activity receiving Federal financial assistance ...," expressly identifies the class Congress intended to benefit); (2) whether the legislative history shows congressional intent either to deny or to provide a private remedy; (3) whether the existence of a private remedy would be consistent with the underlying purposes of the legislation; and (4) whether the action is one more appropriately a concern of state rather than federal law. *Cort,* 422 U.S. at 78, 95 S.Ct. 2080.

(1) to promote the general welfare of the Nation by employing the funds and credit of the Nation, as provided in this chapter-

(A) to assist States and political subdivisions of States to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families;

(B) to assist States and political subdivisions of States to address the shortage of housing affordable to low-income families; and

(C) consistent with the objectives of this subchapter, to vest in public housing agencies that perform well, the maximum amount of responsibility and flexibility in program administration, with appropriate accountability to public housing residents, localities, and the general public;

(2) that the Federal Government cannot through its direct action alone provide for the housing of every American citizen, or even a majority of its citizens, but it is the responsibility of the Government to promote and protect the independent and collective actions of private citizens to develop housing and strengthen their own neighborhoods;

(3) that the Federal Government should act where there is a serious need that private citizens or groups cannot or are not addressing responsibly; and

(4) that our Nation should promote the goal of providing decent and affordable housing for all citizens through the efforts and encouragement of Federal, State, and local governments, and by the independent and collective actions of private citizens, organizations, and the private sector.

In addition to the general policy declaration above, section 1437aa, entitled "Establishment of separate program of assisted housing for Indians and Alaska Natives," provides:

The secretary shall carry out programs to provide low-income housing on Indian reservations and other Indian areas in accordance with the provisions of this subchapter.

42 U.S.C. § 1437aa (1994).

█ The definition of "low-income housing" is "decent, safe, and sanitary dwellings assisted under ... chapter [8]." 42 U.S.C. § 1437a(b) (1994). Thus, § 1437aa instructs the Secretary to carry out programs to provide decent, safe, and sanitary dwellings on reservations and other Indian areas. While the language of the IHA thus includes not only a general policy declaration but also an indication of the class of people that Congress intended to benefit, namely Indians and Alaska Natives, it does not explicitly provide a private damage remedy. In addition to the absence of an explicit private damage remedy, the IHA also contains no enforcement provisions. However, the absence of such provisions alone cannot dispositively preclude the finding of an implied private right of action. It would indeed be the rare case where a private damage remedy was provided in the statute where the same statute did not explicitly provide a private right of action.

When the bill to amend the United States Housing Act of 1937 to establish a separate program to provide housing assistance for Indians ("H.R.3927") was introduced on the floor of the United States House of Representatives, Representative Roukema from New Jersey commented that "[s]eparating Indian housing from public housing will affirm the Federal Government's commitment to provide housing in Indian areas and recognize the unique relationship between the U.S. Government and the Indian tribes and the special housing problems of Indians." 134 Cong. Rec.

10,297 (daily ed. May 10, 1988). When H.R. 3927 was introduced on the floor of the United States Senate, Senator Cranston commented that "[t]he provisions of this act reaffirm the Federal Government's commitment to provide housing in Indian areas and recognize the unique relationship between the U.S. Government and the Indian tribes." 134 Cong. Rec. 14,147 (daily ed. June 10, 1988). Finally, when H.R. 3927 was passed, the House Report noted that "this legislation marks an important step toward enabling Native Americans to work with the Federal Government to obtain decent and affordable housing, to which all Americans are entitled." H.R.Rep. No. 100–604 (1988), *reprinted in* 1988 U.S.C.C.A.N. 791, 792 ("House Report").

 The unique relationship that both the House and Senate recognized exists between the Federal Government and Indians and that is applicable to the IHA is the fiduciary duty of the Government to its Indian wards. *See Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831) (noting that the relationship between the Indians and the government was unique, "[resembling] that of a ward to his guardian"); *Mitchell,* 463 U.S. at 210, 103 S.Ct. 2961 (recognizing the "undisputed existence of a general trust relationship between the United States and the Indian people," which comprises a "distinctive obligation of trust incumbent upon the Government" in Indian affairs). This fiduciary relationship conceived by Justice John Marshall ascribes to the government both a political duty and a moral commitment to the Indians. *Cherokee Nation,* 30 U.S. at 17; *See generally* Kimberly T. Ellwanger,

*Money Damages for Breach of the Federal–Indian Trust Relationship After Mitchell II*—United States v. Mitchell, *463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983),* 59 Wash. L.Rev. 675 (1984).

The foregoing suggests some congressional desire to provide decent, safe, and sanitary housing for low-income Indian families through HUD implementation of Indian Housing projects. However, Congress' high hopes for HUD do not amount to the creation of an implied private cause of action. Congress makes many promises in the IHA. Missing among the promises, even implicitly, is the right to enforce a breach when HUD fails to carry out its mandate. For Dewakuku to prevail, among the many congressional promises must be a private right of action to enforce the substantive law. *Alexander,* 121 S.Ct. at 1519. We cannot agree that Congress created such a right.[2]

 Although the foregoing analysis shows that the IHA sets forth a federal scheme to assist a specific class of beneficiaries, neither the text of the statute nor the legislative history expresses the creation of an implied private right of action. Without a private right of action, Dewakuku's "cause of action does not exist," and this court "may not create one, no matter how desirable that might be as a policy matter,' or how compatible with the statute." *Alexander,* 121 S.Ct. at 1520.

#### b. Intended Beneficiary

 In addition to the foregoing, the Secretary contends that the district court erred in concluding that Dewakuku was an

---

**2.** An analysis of the final *Cort* factor, i.e., whether the action is one more appropriately a concern of state rather than federal law, does not save Dewakuku's claim. Although the statutory language of the IHA unambiguously makes the provision of decent, safe, and sanitary housing the obligation of the Federal Government, that factor does not overcome the complete absence of any other indication that Congress created a private cause of action.

intended beneficiary of the ACC, entitled to bring suit. The Secretary argues that looking beyond the contract terms to see whether Dewakuku had enforceable rights is contrary to the precedent of this court and not supported by the cases upon which the district court based its decision.

■■■■■■ The test for intended third party beneficiary status is whether the contract reflects the intent of the parties to the contract to benefit the third party. *Roedler v. Dep't of Energy*, 255 F.3d 1347, 1352 (Fed.Cir.2001) (citing *German Alliance Insurance Co. v. Home Water Supply Co.*, 226 U.S. 220, 230, 33 S.Ct. 32, 57 L.Ed. 195 (1912) (the benefit to the third party under the contract must be direct); *Caguas Central Federal Savings Bank v. United States*, 215 F.3d 1304, 1309 (Fed. Cir.2000) (the benefit to the third party must be intended by the contract, whether expressly stated or implicit); *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir.1997) (the intended beneficiary need not be specifically identified, but must be in a class clearly intended to be benefited)); *See also U.S. Ecology, Inc. v. United States*, 245 F.3d 1352, 1356 (Fed.Cir.2001). "When the intent to benefit the third party is not expressly stated in the contract, evidence thereof may be adduced." *Roedler*, 255 F.3d at 1352. This evidence must include the language of the contract itself. *See id.* (noting that in determining contractual and beneficial intent when the contract implements a statutory enactment the court must look to the statute). In analyzing the language itself to ascertain intent, we look to whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him. *US Ecology*, 245 F.3d at 1356; *Montana*, 124 F.3d at 1273. Thus, to determine whether Dewakuku is an intended third party beneficiary, this court must ask if she could have reason-

ably relied on the "promises" in the ACC as manifesting rights in her.

Section 0.2(d) of the ACC provides that [t]he IHA shall at all times develop and operate each Project (1) solely for the purpose of providing decent, safe, and sanitary Homes … within the financial reach of Homebuyers … (2) in such manner as to promote serviceability, efficiency, economy, and stability, and (3) in such manner as to achieve the economic and social well-being of the Homebuyers.

This section of the ACC does appear to express an intent to benefit homebuyers such as Dewakuku directly. However, as the district court correctly recognized, "the contract clearly states that it does not create or justify any third party claim." *Dewakuku v. Cuomo*, at 1133. In fact, the plain language of section 14.6 of the contract is entitled "NO THIRD PARTY CONTRACT RIGHTS CONFERRED," and states that "[n]othing in the ACC shall be construed as creating or justifying any claim against HUD by any third party."

HUD contends that given the unambiguously clear language of this disclaimer, it would be unreasonable for any third party to rely on the promises in the ACC as manifesting an intention to confer a right on him or her. Dewakuku contends, on the other hand, that this language is only unambiguous in isolation, but when read within the broad context of the ACC, it is anything but clear. According to Dewakuku, the foregoing disclaimer can refer to incidental contractual beneficiaries, such as contractors, rather than intended beneficiaries. Moreover, Dewakuku contends that this is what that contractual provision must mean because the ACC's sole purpose is to benefit Hopi homebuyers like her. In addition, Dewakuku contends that if we were to ascribe the "broad" meaning to this disclaimer, such a construction

would ignore the principles of contract construction that "(i) an interpretation which gives a reasonable meaning to all parts of a contract will be preferred to one which leaves a portion of it inoperative or superfluous; and (ii) that contract provisions should not be construed as conflicting unless no other reasonable interpretation is possible." *Morrison–Knudsen Co. v. United States*, 184 Ct.Cl. 661, 397 F.2d 826, 842 (1968).

We agree with HUD. The contractual language is not ambiguous. Rather, it is clear in expressing the parties' intentions to extinguish the rights of any third party under the ACC. While we recognized earlier in this opinion the unique relationship between the federal government and the Indian tribes, there is simply no warrant for limiting language of the ACC barring "any claim against HUD by any third party" to claims brought only by contractors.

Dewakuku has not given this court sufficient justification for why it should ignore the plain language of the disclaimer. In the first place, none of the provisions of the contract would be inoperative, superfluous, or conflicting if the term "third party" in the disclaimer is given its broadest interpretation. The IHA is still required to perform for HUD its obligations under the contract. Second, if we were to limit the term "third party" in the disclaimer in the way that Dewakuku suggests, this court would have to substitute its judgment for that of the contracting parties based on mere speculation that the parties intended to create enforceable rights for housing recipients like Dewakuku.

As noted in *US Ecology*, "[i]f the federal government had intended for the alleged contract to confer a right upon a third party, it could have expressly provided such a right in the contract documents." 245 F.3d at 1357. Here, not only did the parties to the ACC omit language conferring third party rights, the parties made it a point to include a contractual provision that no third parties shall be able to make a claim against HUD based on the ACC. Thus, we hold that Dewakuku is not an intended third party beneficiary of the ACC and, as a result, cannot enforce HUD's contractual rights.

## CONCLUSION

The statutory language, structure, and legislative history of the IHA do not expressly or impliedly create a private right of action thereunder for plaintiffs like Dewakuku. The district court's conclusion to the contrary is erroneous and is hereby reversed. Furthermore, because the ACC clearly states that no third party action is created or justified by any of its provisions, Dewakuku could not have reasonably relied on the "promises" in the ACC to grant rights to her. Thus, the district court also erred in concluding that Dewakuku is an intended beneficiary under the ACC.

The district court did not consider Dewakuku's claim under the APA because it deemed the relief afforded thereunder to be duplicative of the relief it had already awarded. Because we have reversed the district court's determination regarding Dewakuku's other claims, we remand to the district court so that it can determine whether to consider the APA claim.

*REVERSED AND REMANDED*

### COSTS

No costs.