# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 01-2521

_____

United States of America,      *

           *

       Appellee,      *

           *      Appeal from the United States

    v.               *      District Court for the

           *      District of South Dakota.

Orville Milk,      *

           *

       Appellant.      *

_____

Submitted: December 11, 2001
Filed: February 26, 2002

_____

Before WOLLMAN,[1] Chief Judge, HANSEN, Circuit Judge, and FENNER,[2] District
     Judge.

_____

HANSEN, Circuit Judge.

     A South Dakota federal jury convicted Orville Milk of conspiracy to distribute
a controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and possession

---

[1]The Honorable Roger L. Wollman stepped down as Chief Judge of the United
States Court of Appeals for the Eighth Circuit at the close of business on January 31,
2002. He has been succeeded by the Honorable David R. Hansen.

[2]The Honorable Gary A. Fenner, United States District Judge for the Western
District of Missouri, sitting by designation.

of marijuana with intent to distribute within 1000 feet of a public housing authority, in violation of 21 U.S.C. §§ 860 and 841(a)(1). Milk appeals only the conviction for possession with intent to distribute within 1000 feet of a public housing authority, arguing that a tribal housing authority does not fall within the meaning of "public housing authority" as used in 21 U.S.C. § 860 and that the district court erred in failing to give lesser included offense instructions to the jury. We affirm the judgment of the district court.[3]

## I.

Law enforcement officials intercepted a suspicious package sent from California to the Pine Ridge Indian Reservation in Wanblee, South Dakota. After a drug detecting dog alerted to the package, the police obtained a warrant, opened the package, and found 885 grams (nearly two pounds) of marijuana inside it. The police removed most of the marijuana from the package and replaced it with oatmeal and a tracking device that would alert the police when someone opened the parcel. After resealing the package, the local police turned the package over to officers in the Safe Trails Drug Enforcement Task Force ("Task Force"). The officers conducted a controlled delivery of the parcel to the Long Creek Store on the Pine Ridge Indian Reservation where Vine Black Feather picked up the package. The police followed Black Feather to Orville Milk's residence.

At least two members of the Task Force were already positioned at Milk's residence before Black Feather arrived. The Task Force was surveilling Milk's residence because the intercepted package, which had "Orve" written on it , aroused the officers' suspicions that Milk was involved in this drug conspiracy. Shortly after Black Feather arrived at and entered Milk's residence, the tracking device activated,

---

[3]The Honorable Richard H. Battey, United States District Judge for the District of South Dakota.

indicating that someone had opened the parcel. Within forty seconds of hearing the alert, one of the officers already positioned at the residence approached the trailer and knocked on the door. Vine Black Feather opened the door. The authorities observed Milk through the open door; he was standing within arm's length of the parcel which was lying open on the kitchen table. The police placed Black Feather and Milk under arrest and, after obtaining a warrant, searched the residence. Upon searching the residence, the police found, among other things, a thermos containing marijuana residue; 28 grams of marijuana inside a "Tidy Cat" cat litter bag; two stacks of United States currency, each containing 50 one-dollar bills; two money order receipts in the amount of $700 each from Milk to Don Bice in Gualala, California; a scale of the type typically used to measure marijuana; a marijuana pipe; and another quantity of marijuana.

Milk's residence was a house trailer parked on a piece of property owned by the Oglala Sioux Tribe and managed by the Oglala Sioux Housing Authority ("OSHA"). OSHA is part of the tribe's governmental operations. OSHA's housing programs were previously administered by the federal Department of Housing and Urban Development ("HUD"); however, pursuant to the Native American Housing Assistance and Self-Determination Act (NAHASDA), Pub. L. No. 104-330, 110 Stat. 4016, HUD stopped operating the programs, and OSHA assumed control of them. At the time the events underlying this case occurred, Jasper Milk, Orville's father, was enrolled in one of OSHA's home ownership programs and was in the process of purchasing this property from OSHA. Jasper resided on the property, and Orville's trailer was located between 150 and 200 feet from Jasper's residence.

An indictment was filed in the United States District Court for the District of South Dakota, charging Milk with the aforementioned crimes. The case proceeded to trial. Milk requested a jury instruction both prior to trial and at the close of evidence setting forth his definition of "public housing authority." Milk's proposed instruction defined a "public housing authority" as follows:

3

The term "Public Housing Authority" is defined as a public housing agency that participates in public housing. A public housing agency means any State, County, municipality, or other governmental entity or public body, or agency or instrumentality thereof which is authorized to engage in or assist in the development or operation of public housing.

(Appellant's App. at 4.) The district court rejected Milk's proposed instruction and drafted its own jury instruction. The district court's instruction defined "public housing authority" as an "agency created by a federal, state, local or tribal government body for the purposes of making housing available to qualified individuals." (Id. at 6.) Milk moved for judgments of acquittal after the close of the government's case and after the close of the evidence, arguing that because the term "public housing authority" within the meaning of 21 U.S.C. § 860 does not include tribal housing authorities, Milk was not guilty as a matter of law. The district court denied the motions. Milk also proposed jury instructions for two lesser included offenses: possession of marijuana with the intent to distribute, in violation of 21 U.S.C. § 841, and possession of marijuana, in violation of 21 U.S.C. § 844. The district court denied Milk's request to give these two lesser included offense instructions, the jury convicted him of the charged crimes, and he appeals.

II.

**A. The meaning of "public housing authority" as used in 21 U.S.C. § 860.**

The crime of possession of marijuana with intent to distribute within 1000 feet of a public housing authority has four essential elements: (1) the defendant possessed marijuana, (2) the defendant knew that he was in possession of a controlled substance, (3) the defendant intended to distribute some or all of the marijuana to another person, and (4) the defendant possessed the marijuana within 1000 feet of a housing facility owned by a public housing authority. See 21 U.S.C. § 860. Milk argues that the district court erred when it denied his motions for judgment of acquittal and when it gave the jury an instruction indicating that tribal housing

4

authorities were within the meaning of "public housing authority" as used in § 860. Each of these alleged errors followed from the district court's interpretation of the statute. We review questions of statutory interpretation de novo. United States v. McIntosh, 236 F.3d 968, 972 (8th Cir.), cert. denied, 121 S. Ct. 1964 (2001).

The starting point in any question of statutory interpretation is the language of the statute itself. Id. at 971. The statute at issue in this case provides that:

> Any person who violates section 841(a)(1) of this title or section 856 of this title by distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of [a] . . . housing facility owned by a public housing authority . . . is . . . subject to (1) twice the maximum punishment authorized by section 841(b) of this title; and (2) at least twice any term of supervised release authorized by section 841(b) of this title for a first offense.

21 U.S.C. § 860 (1994). Where the language of a statute "is unambiguous, the statute should be enforced as written unless there is clear legislative intent to the contrary." McIntosh, 236 F.3d at 972. The text of the statute indicates that the enhanced penalties for conducting drug transactions apply whenever the transaction occurs within 1000 feet of any housing facility owned by a "public housing authority," which plain language in our view means only nonprivate sector, i.e., governmental, housing authorities. The statute does not distinguish between federal, state, local, county, or even tribal housing authorities. Because the text of the statute does not limit its application to any specific type of public housing authority, we decline to read that distinction into the statute. See id. at 972 ("'Courts are obligated to refrain from embellishing statutes by inserting language that Congress has opted to omit.'") (quoting Root v. New Liberty Hosp. Dist., 209 F.3d 1068, 1070 (8th Cir. 2000)).

Milk advances two arguments in an attempt to circumvent the plain language of the statute. First, Milk argues that "public housing authority" is a term of art

5

specifically defined in other parts of the Code as excluding Indian housing authorities. Second, Milk argues that clear legislative history demonstrates that "public housing authority" does not include Indian housing authorities. Both of his arguments hinge upon a definition of "public housing authority" found in Title 34 of the Code of Federal Regulations (C.F.R.) and in Title 42 of the United States Code.

Title 34 of the C.F.R. defines a"public housing authority" as a "public housing agency, as defined in 42 U.S.C. § 1437a(b)(6)." 34 C.F.R. § 461.30 (c)(2) (2001). Title 42 U.S.C. § 1437a(b)(6) defines a public housing agency as "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing." 42 U.S.C. § 1437a(b)(6)(A) (Supp. IV 1998). When Congress amended 21 U.S.C. § 860 in 1994 to include housing facilities owned by a public housing authority as a specially protected area under the Controlled Substances Act, see Pub. L. No. 103-322 § 320107(1), 108 Stat. 1796, the Title 42 definition of "public housing agency" explicitly included "any Indian housing authority." 42 U.S.C. § 1437a(b)(6) (1994), amended by, Pub. L. No. 104-330 § 501, 110 Stat. 4016. In 1998, Congress amended Title 42, deleting the phrase "[t]his includes any Indian housing authorities" from the § 1437a definition. See Pub. L. No. 104-330 § 501(b)(1)(B), 110 Stat. 4016. The statutory history suggests that, at least for the purposes of Title 34 of the C.F.R. and Title 42 of the Code, "public housing agencies" do not presently include Indian housing authorities. Milk seizes upon this current definition and argues that it is controlling in this case.

Despite its initial appeal, we conclude that Milk's argument–that "public housing authority" is a term of art authoritatively defined for all purposes in 42 U.S.C. § 1437a(b)(6)–overreaches. The definitions upon which Milk relies are themselves self-limiting. The C.F.R. definition is contained in the Department of Education's regulations and is expressly limited "[f]or the purposes of this part." 34 C.F.R. § 461.30(c)(2). The Title 42 definition of public housing agency is limited to

6

the chapter containing it.  See 42 U.S.C. § 1437a(b) ("When used in this chapter:... 'Public housing agency'. . . means . . ." (emphasis added)).  Moreover, Milk identifies no authority for the proposition that the definition of a term in one Title of the United States Code applies uniformly throughout the Code.  On the contrary, the Supreme Court has indicated that this is not the case.  See United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 213 (2001) ("'The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them . . . has all the tenacity of original sin and must constantly be guarded against.'") (quoting Cook, "Substance" and "Procedure" in the Conflict of Laws, 42 Yale L.J. 333, 337 (1993)).  Thus, we conclude that the definition of public housing authority as contained in Title 34 of the C.F.R. and Title 42 of the Code does not limit the otherwise plain scope of the meaning of "public housing authority" as used in 21 U.S.C. § 860.

We also find no clear legislative history indicating that "public housing authority" within the meaning of 21 U.S.C. § 860 does not include tribal housing authorities.  See McAllister, 225 F.3d 982, 986 (8th Cir. 2000) (stating that purpose of statutory interpretation is to give effect to the intent of Congress and that text will be enforced as written absent clear legislative intent to the contrary).  History reveals that over the last 70 years Congress has come to treat Indian housing programs differently than general public housing programs.  See Dewakuku v. Cuomo, 107 F. Supp. 2d 1117, 1118-24 (D. Ariz. 2000) (summarizing history of Indian housing programs), rev'd by Dewakuku v. Martinez, 271 F.3d 1031 (Fed. Cir. 2001).  Congress's most recent comprehensive legislation concerning Indian housing programs, NAHASDA, was enacted to help achieve "economic self-sufficiency and self-determination for tribes and their members."  25 U.S.C. § 4101(6) (Supp. IV 1998).  Undoubtedly, NAHASDA was enacted to create housing programs uniquely targeted to Indian tribes and to decouple the administration of Indian housing programs from the administration of other non-Indian housing programs.  See 25 U.S.C. § 4101 (1) and (2) (stating that Federal Government has a unique

responsibility to Indian tribes).  The policy purposes motivating NAHASDA and the Controlled Substances Act are separate and distinct, however; and Milk never explains why or how the creation of housing programs uniquely tailored to tribal governments evidences any Congressional intent to create tribal exceptions to otherwise generally applicable drug laws.  More important, Milk never identifies <u>any clear</u> legislative history indicating that NAHASDA was meant to modify the scope of 21 U.S.C. § 860.  <u>See</u> <u>McIntosh</u>, 236 F.3d at 972 ("If the language is unambiguous, the statute should be enforced as written unless there is <u>clear</u> legislative intent to the contrary.") (emphasis added).  Actually, NAHASDA evinces a concern with drug-related activity that undermines Milk's argument.  <u>See</u>, <u>e.g.</u>, 25 U.S.C. § 4137(a)(6)(C) (providing that landlords must use leases that allow eviction if tenant is engaged in drug-related criminal activity).  We think it odd that Congress would want to leave Indian housing authorities outside of the protection of 21 U.S.C. § 860.

We conclude that the definition of public housing authority found in Title 34 of the C.F.R. and in Title 42 of the Code is neither controlling nor persuasive.  In addition, there is no clear legislative history demonstrating that Congress wanted to exempt tribal housing authorities from the operation of 21 U.S.C. § 860.  Because the plain language of the statute makes no distinction between one type of public housing authority and another, we conclude that the term "public housing authority" includes all public housing authorities–whether created by federal, state, local, or tribal governments.  Accordingly, our statutory analysis is at an end.  <u>See</u> <u>Connecticut Nat'l Bank v. Germain</u>, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'") (quoting <u>Rubin v. United States</u>, 449 U.S. 424, 430 (1981)); <u>McAllister</u>, 225 F.3d at 986 ("Therefore, if the intent of Congress can be clearly discerned from the statute's language, the judicial inquiry must end.").

**B. Lesser included offenses.**

Milk also argues that the district court erred by refusing to submit lesser included offense instructions to the jury. We give deference to the district court's formulation of jury instructions, and we review those instructions only for an abuse of discretion. United States v. Parker, 32 F.3d 395, 400 (8th Cir. 1994). Generally, the defendant is not entitled to any particular instruction if the given instructions, "when viewed as a whole, correctly state the applicable law and adequately and fairly cover the substance of the requested instruction." Id. at 400. It is beyond dispute, however, "that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." Keeble v. United States, 412 U.S. 205, 208 (1973). Specifically, a defendant is entitled to a lesser included offense instruction when:

(1)    a proper request is made;

(2)    the elements of the lesser offense are identical to part of the elements of the greater offense;

(3)    there is some evidence which would justify conviction of a lesser offense;

(4)    the proof on the element or elements differentiating the two crimes is sufficiently in dispute so that the jury may consistently find the defendant innocent of the greater and guilty of the lesser included offense; and

(5)    there is mutuality, i.e., a charge may be demanded by either the prosecution or defense.

United States v. Short, 805 F.2d 335, 336 (8th Cir. 1986).

Milk's first argument–that he was entitled to an instruction for possession with intent to distribute not within 1000 feet of a housing facility owned by a public housing authority–has little merit. This argument merely recasts his statutory interpretation argument–that the district court erred in denying his motions for acquittal and in giving an instruction indicating that a tribal agency could be a public

housing authority within the meaning of 21 U.S.C. § 860. Under the fourth part of the aforementioned test, there is no disputed element which could have led the jury to convict Milk of ordinary possession with intent to distribute but not possession with intent to distribute within 1000 feet of a housing facility owned by a public housing authority. It is undisputed that Milk's residence was within 1000 feet of Jasper's residence and that Jasper's residence was a housing facility owned by OSHA. Accordingly, Milk was not entitled to have this proposed instruction submitted to the jury.

We find Milk's second argument–that he was entitled to an instruction for simple possession without the intent to distribute– more troublesome than his first. For Milk to prevail, the proof on the element differentiating the two crimes–Milk's intent to distribute–must have been sufficiently in dispute such that the jury could have acquitted Milk for possession with the intent to distribute within 1000 feet of a housing facility owned by a public housing authority but convicted him of simple possession. "If that intent is not in dispute to the degree the jury could [have] rationally convict[ed] [Milk] of simple possession and acquit[ted] [him] of possession with intent to distribute, [Milk is] not entitled to the instruction." Short, 805 F.2d at 337.

In support of his argument that he was entitled to an instruction for simple possession, Milk cites United States v. Brischetto, 538 F.2d 208 (8th Cir. 1976). In Brischetto, we held that the district court abused its discretion by failing to instruct the jury on the lesser included offense of simple possession where the defendant was indicted for possession with the intent to distribute. Id. at 209. In Brischetto, the government's evidence tending to establish intent was weak. The government's only evidence of intent to distribute was the permissible inference of intent which may arise from the possession of a large quantity of a controlled substance and the testimony of Brischetto's indicted accomplices who had already pleaded guilty at the time of Brischetto's trial. Id. at 210. On the other side of the ledger, the defendant

testified on his own behalf that he did not intend to sell any marijuana. Id. Brischetto's testimony was bolstered by two government agents who admitted under cross examination that "Brischetto had not made any offers to sell marijuana in their presence." Id. The evidence was such that a jury could have rationally convicted him of simple possession. In fact, we noted that the "evidence in support of the simple possession charge is stronger than that on the intent to distribute charge." Id.

In subsequent cases, we have distinguished Brischetto and limited its scope. We have concluded that where the intent to distribute was not sufficiently in dispute, then the district court would not abuse its discretion in refusing to instruct the jury on the lesser included offense of simple possession of a controlled substance where the defendant was charged with possession with the intent to distribute. Parker, 32 F.3d at 401; Short, 805 F.2d at 377. In Parker and Short, several facts militated in favor of finding that the defendants were not entitled to lesser included offense instructions. In neither case did the defendants present evidence of acquisition for personal use. See Parker, 32 F.3d at 401 ("In the present case, however, there was no evidence of acquisition for personal use. . ."); Short, 805 F.2d at 337 ("Brischetto is distinguishable . . . . The district court record is devoid of any evidence to support the defendants' contention on appeal that the marijuana was intended solely for personal consumption."). In both cases, the government presented strong physical evidence establishing the defendants' intent to distribute. See Parker, 32 F.3d at 401 (listing a note enclosed in the intercepted package and documentation of money transfers as key pieces of physical evidence establishing intent); Short, 805 F.2d at 336 (stating fact that defendants were arrested with 279 pounds of marijuana raised strong inference of intent to distribute). Finally, in Parker, the government presented testimony of persons, other than indicted accomplices, who had purchased methamphetamine from the defendants before. See Parker, 32 F.3d at 401.

We recognize that this case lies somewhere between Brischetto on the one hand and Parker and Short on the other. Several facts lead us to conclude, however, that

11

this case is more like <u>Parker</u> and <u>Short</u>, less like <u>Brischetto</u>, and that the district court did not abuse its discretion in refusing to give the jury a simple possession lesser included offense instruction. Unlike Brischetto, Milk offered no evidence to support his theory that he possessed marijuana for personal consumption purposes only. The dearth of evidence supporting the proposition that Milk possessed marijuana for personal consumption purposes only is compounded by the fact that, in this case, the government presented more compelling evidence of intent to distribute than in <u>Brischetto</u>. In <u>Brischetto</u> the only credible evidence of intent to distribute was the "amount of marijuana." <u>Parker</u>, 32 F.3d at 401. In this case the government introduced physical evidence of intent to distribute, including: drug quantity inconsistent with personal consumption purposes; a scale used to weigh marijuana; two money order receipts from Milk to a California resident (the state from which this shipment of marijuana arrived); the package containing the marijuana which had "Orve" written on it, creating the strong inference that the package was destined for Milk; and two stacks of U.S. currency. <u>Cf.</u> <u>Parker</u>, 32 F.3d at 401 (noting that physical evidence of intent to distribute combined with fact that defendant presented no evidence of possession for personal consumption purposes militated in favor of finding that district court did not err in refusing to give the jury lesser included offense instructions). Our conclusion is bolstered by the fact that, at trial, Milk never really challenged the intent to distribute element of the offense as charged. Instead, his theory of the case was to shift responsibility for the contraband to Black Feather and to deny possession. For example, during opening statements Milk's attorney stated that "[t]here's not going to be evidence as to who possessed those things [referring to marijuana found in the house] . . . ." (Trial Tr. at 54.) In closing, Milk's attorney argued that "[t]here was never any proof provided to you and never any evidence of who owned that marijuana. . . . They didn't prove anything as to whether Mr. Milk ever knew this stuff even existed . . ." (Id. at 238.) He continued, stating that "Mr. Milk had no opportunity, no time, no ability in the confines of this case to . . . effectuate possession of this package." (Id. at 240.) He continued, stating that "Mr. Milk had not gained possession of that package." (Id. at 240.) Thus, if the jury

12

would have credited Milk's version of the events, it would have acquitted him of the charged crimes; but, because Milk denied possession, it could not have rationally convicted him of the lesser included offense of simple possession and acquitted him of possession with intent to distribute.

In similar circumstances, this court has concluded that wholly exculpatory evidence does not entitle the defendant to have lesser included offense instructions given to the jury. See United States v. Collins, 652 F.2d 735, 742 (8th Cir. 1981) (holding that the district court did not err in refusing to give a lesser included instruction for simple possession when the defendant was convicted of conspiracy to possess with the intent to distribute and possession with the intent to distribute), cert. denied, 455 U.S. 906 (1982). In Collins, we reasoned that where the defendant's claim "was complete innocence," "[t]he jury either believed she had nothing to do with the transaction or was guilty as charged. There was not a rational basis for instructing the jury on lesser included offenses. . . ." Collins, 652 F.2d at 742. Similarly, we conclude here that the trial court did not err in refusing to give the jury either of the requested lesser included offense instructions.

III.

We conclude that the district court did not err in denying Milk's motions to acquit or in giving the jury instructions indicating that a "public housing authority" could include tribal housing authorities. We also conclude that the district court did not err in refusing to give the jury Milk's requested lesser included offense instructions because the evidence presented at trial did not seriously call into question the fact that Milk possessed marijuana with the intent to distribute it. Accordingly, we affirm the judgment of the district court.

13

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.